549 A.2d 393

**Richard A. BENNETT, Jr., et al.**

v.

**BASKIN & SEARS, et al.**

**No. 17, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

Nov. 2, 1988.

John C. Keeney, Jr. (Wendy L. Wysong and Hogan & Hartson, on the brief), Washington, D.C., for appellants.

Albert D. Brault (Janet S. Zigler and Brault, Graham, Scott & Brault, on the brief), Rockville, for appellees.

Argued before WILNER, ROBERT M. BELL and POLLITT, JJ.

ROBERT M. BELL, Judge.

The former directors of First Montgomery Bank and Trust Company (in organization) ("First Montgomery"), as assignees of First Montgomery, in this appeal of the judgment of the Circuit Court for Montgomery County, challenge the correctness of that court's ruling granting summary judgment on limitation grounds in favor of Baskin & Sears and its successors, appellees. The nature of their challenge is embodied in the three questions they present:

1. Does the Statute of Limitations bar this action filed September 24, 1984, where the transcript of the September 15, 1981, meeting (relied on by the court below) shows:

a. not a single mention of a claim or basis for a claim against the law firm (but only claims against Daniel D. Morse) ...;

b. that a member of the law firm stated only "No" in answer to the question "Do you represent Daniel Morse?" ..., thereby actively concealing the past dual representation;

c. that the lawyer promised "to get back to the Board after I've discussed with Pittsburgh [main office]" in response to a question about "whether it has any ideas

as to the norms when you start up a new bank for development fees," ... thereby actively concealing the past malpractice; and

d. that the lawyer continued to serve as counsel in a fiduciary capacity, thereby excusing any failure of the directors to use greater diligence in discovering the law firm's wrongdoings.

2. Was the Statute of Limitations tolled by the July 9, 1984, filing of the third-party complaint which involved exactly the same parties, the same facts, and the same claims?

3. Is a full trial on the merits required by the trial court's disregard of the factual disputes established by the details in the Blunt affidavit ... regarding a directors' lack of knowledge on September 15, 1981, and the fact that "it was not until October 29, 1981," that the Board of Directors learned that it had potential claims against Baskin & Sears?

This action has its genesis in 1979, when a group of persons, which included some of the appellants and Daniel D. Morse, came together for the purpose of organizing a minority bank in Montgomery County, Maryland. To assist in the organization of the bank, the founders and original directors retained the services of appellees and Danmor Financial Management Services, Inc., a financial consulting corporation, of which Morse, one of the more active and significant members of the group, was the president.

First Montgomery agreed to pay Danmor $50.00 per hour plus reimbursement for expenses incurred during the organizational period. Danmor would be paid for no more than 100 hours of work in any month, the excess to be deferred until money was available. In return, Danmor agreed to perform the necessary services and to provide detailed invoices of the services it performed on behalf of the bank to First Montgomery.

The organizational period for First Montgomery was lengthy. By the fall of 1980, the bank, based on bills

submitted by Danmor for services rendered in excess of the allotted monthly payment, was indebted to Danmor in an amount of approximately $78,000.00. At the suggestion of Jackley, the partner primarily responsible for providing services on behalf of appellees, the Board of Directors ratified that indebtedness and later executed a promissory note in favor of Danmor in the amount of $78,894.00.

In 1981, the bank was in the process of seeking the approval by the Federal Deposit and Insurance Corporation of an application for insurance to cover deposits. Having hired a president and a chief operating officer, received a copy of an FDIC guideline stating that seventy percent of the banks organized incurred organization fees of less than $20,000.00, and been advised by the regional director of the FDIC that Danmor's fees "are high considering its modest proposal ... [and] will be subject to a careful review during both the field and regional office investigation of this proposal," the directors became concerned that Morse and Danmor had charged excessive organizational fees. Consequently, the Board organized a committee of several directors to audit Morse and Danmor. The audit committee presented its findings at a board meeting held on September 15, 1981. Those findings led to Morse's resignation as chairman of the Board.

After Morse's resignation had been accepted and he had left the meeting, the Board discussed a number of concerns that it had. One concern involved the question of whether Jackley represented Morse. When asked that question, Jackley responded "no". Another concern was the impending evaluation by an FDIC examiner of the organizational fees incurred by First Montgomery. The transcript of the meeting reveals the following, in that regard:

MR. BENNETT [A director]: I'd like to ask our counsel whether it has done any other work representing banks; and, secondly, in its opinion as counsel to this bank, whether it has any ideas as to the norms when you start up a new bank for development fees, et cetera, to give us some guideline as to what in your experience, if you have

any in this regard, is acceptable or normal for someone who has performed the services which we recognize Dan has rendered.

MR. JACKLEY: All right. Our Maryland office, asking this here, says not. The Pittsburgh office has—I have a call into the Pittsburgh office to get some indication of the normal fees in the normal setting. There have been some extenuating circumstances, perhaps for lack of a better word, which I think the Board is aware of, the changes in midstream when the Securities Commissioner changed his opinion, when the Bank Commissioner changed his opinion.

The FDIC guidelines in Appendix A indicate what the normal fees that they run into are. You will see that they are substantially less than the amount that [Danmor] has charged. I advised Mr. [Morse] and [Danmor] as of late last week to immediately obtain other counsel and strongly suggest that they do obtain counsel. Whether Mr. [Morse] will choose that course of action or proceed without counsel at this point, I am not sure.

MR. BENNETT: Are you going to advise—I'm not sure if he really answered.

MR. JACKLEY: Okay. So a two-part, I will get back to the Board after I've discussed with Pittsburgh what the experiences have been as far as startup costs. It will primarily be with branch bank establishment of branch offices and as to the legal fees and the market study fees, the feasibility fees the coordination fees.

MR. BENNETT: And particularly since I assume you're familiar with the many services which Dan has provided, the fees which would normally be paid to someone who's has provided those services, I'd like to request that as soon as you have that information, that you phone it to John Days so that he can relay it to the Board.

Mr. Bennett raised still another area of concern when he asked Jackley to "advise us as to whether, if we are unable to reach an amicable settlement with Dan; Are you going to

be in [an untenable] conflict of interest position?" Jackley responded:

I'll have to struggle with that too. Relative to general advice and counsel to the bank, the answer to that question is "no".

Relative to filing a replevin suit on the return of the books and records, the answer is "no".

We have as I indicated, advised [Danmor] and Dan [Morse] to obtain independent counsel.

Now, relative to suit over either the meaning of [hold] harmless agreement or anything like that. My feeling at this point is that we would recommend that that be referred out to independent counsel: (a) because of the appearance potentially of a conflict of interest; and also from a practical standpoint and that is that we are going to have to testify as to what came down at some of these meetings according to our notes.

And, our, you know, notes do not indicate what Mr. [Morse] remembers what happened at some of those meetings; and also some of what Mr. Blunt, as he and I have talked about, happened at some of those meetings. And, it's tough when you're going back three and four years.

But, I would suspect that if it does go to litigation, as I said, you know, we certainly, you know, need the testimony.

Some time in October, the Board consulted Hogan & Hartson, as independent counsel, to consider its position vis-a-vis claims which the Board anticipated Morse and Danmar would make for organizational fees incurred.[1] Significantly, Hogan & Hartson reported in its preliminary report that it had also been asked "to determine whether

---

1. In a confidential memorandum dated October 29, 1981, from David J. Henslar to the Board of Directors of First Montgomery, re: "Preliminary Report of Special Counsel", Hogan & Hartson asserted that it had been retained as special counsel to First Montgomery approximately two weeks before.

there was any basis for claims against Baskin and Sears (B & S), First Montgomery's former general counsel." Although it had not reached any firm conclusions as to that question, it recommended three areas to be pursued: (1) whether Baskin and Sears had a conflict of interest while representing First Montgomery; (2) whether Baskin and Sears have disclosed that the organizational expenses charged were excessive; and (3) whether Baskin and Sears made material omissions and misstatements in the offering circular.

Morse and Danmor filed suit against First Montgomery and its directors in December, 1983, seeking to recover on the promissory note in favor of Danmor as well as additional compensation they claimed the bank owed them. Having failed to obtain a defense from appellees, appellants filed the Morse/Danmor action a third-party claim against appellees in 1984. Appellee moved to dismiss that complaint on September 10, 1984 and, in response to that motion, on September 24, 1984, appellants filed this independent action. Their motion to consolidate this action with the Morse suit was denied. Their third-party complaint was dismissed in December 1985.

The Morse suit having been resolved in favor of First Montgomery, appellees moved for summary judgment as to this action, *inter alia*, alleging that it was barred by limitations. Appellants responded by submitting the affidavit of Roger R. Blunt, one of the founders and former directors of First Montgomery, with their opposition to the motion. In his affidavit, Blunt averred that the directors did not know on September 15, 1981, "that attorney Michael Jackley had committed any wrongful acts for which he or his firm might be liable in damages to First Montgomery", and that it was not until October 29, 1981 that the Board, having received the report of the special counsel, became aware that it might have claims against appellee. In his view, "[t]he earliest date on which the Board of Directors could have known that First Montgomery might have been injured by Mr. Jackley's dual representation of Daniel

Morse/Danmor and First Montgomery was when it obtained, in late October 1981 or early November 1981, copies of the Daniel Morse/Michael Jackley correspondence of November 17 and November 20, 1980 in which Jackley advised Morse to obtain a note from First Montgomery for Morse's tax—planning purposes, an action which Jackley recommended to First Montgomery at the board meeting of November 24, 1980. The affidavit further stated that:

Although the Board of Directors was informed at the September 15, 1981 meeting of the FDIC guideline figure and appendix A (1976), it did not know whether appendix A was still applicable; it asked Mr. Jackley to check and report back. Mr. Jackley did not subsequently report back to the Board.

Following a hearing, the court granted appellees' motion for summary judgment on the ground of limitations. It found pertinent to the ruling the facts that the Board inquired of Jackley whether he represented Dan Morse and that Jackley advised the Board that he had "advised Mr. [Morse] and [Danmor] as of late last week to immediately obtain other counsel and strongly suggest that they do obtain counsel". Then, referring to the total circumstances, the court said:

The board meeting shows that the board was fully on inquiry and made inquiry, and the evidence further discloses that the very purpose of inquiry notice was served when a separate law firm was engaged within a very short time thereafter and rendered, in response to a request, a decision that the defendants here might be liable for some or all of the damages involved.

There is, in my view, nothing to submit to a jury. As a matter of law, the minutes of the meeting of September 15th and all of the surrounding circumstances, combined with all of the other filings here, the nature of the pleadings and the nature of the claims, and the date upon which the action which form the basis for the alleged claim of negligence, all add up to one thing: There was complete inquiry notice, totally documented, as is so rare,

by the recorded transcript, that as of that date and no later the statute of limitations began to run.

### 1., 3.

As pertinent to this case, the summary judgment rule, 2–501, provides:

(a) *Motion.*—Any party may file at any time a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any materi- al fact and that the party is entitled to judgment as a matter of law. The motion shall be supported by affidavit filed before the day on which the adverse party's initial pleading or motion is filed.

(b) *Response.*—The response to a motion for summary judgment shall identify with particularity the material facts that are disputed. When a motion for summary judgment is supported by an affidavit or other statement under oath, an opposing party who desires to controvert any fact contained in it may not rest solely upon allegations contained in the pleadings, but shall support the response by an affidavit or other written statement under oath.

* * * * * *

(e) *Entry of Judgment.*—The court shall enter judgment in favor of or against the moving party if the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law....

Pursuant to the Rule, the hearing judge may grant summary judgment only when, after reviewing the pleadings, depositions, answers to interrogatories, admissions and affidavits submitted by the parties, he or she determines that there is no genuine issue of material fact, *i.e.,* one that somehow affects the outcome of the case, *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985), and that the party for whom judgment is entered is entitled to judgment as a matter of law. Maryland Rule 2–501(e); *Dietz v. Moore,*

277 Md. 1, 4, 351 A.2d 428 (1976); *Castiglione v. The Johns Hopkins Hospital*, 69 Md.App. 325, 332, 517 A.2d 786 (1986); *May Department Stores v. Harryman*, 65 Md.App. 534, 538, 501 A.2d 468 (1985), *aff'd*, 307 Md. 692, 517 A.2d 71 (1986). When we review a lower court's ruling on a motion for summary judgment, we too are concerned with whether there is a genuine dispute as to any material fact and whether the moving party is entitled to judgment as a matter of law. We, like the lower court, must view the facts in the light most favorable to the party against whom the motion is made and resolve all inferences against the moving party. *Austin v. Thrifty Diversified, Inc.*, 76 Md. App. 150, 152–3, 543 A.2d 889 (1988); *May Department Stores*, 65 Md.App. at 538, 501 A.2d 468; *Schlossberg v. Epstein*, 73 Md.App. 415, 423, 534 A.2d 1003 (1988). We will not disturb the lower court's ruling unless our review reveals that there is a genuine dispute as to a material fact or that more than one inference can be drawn from the facts.

At issue in the case *sub judice* is when does the three-year statute of limitations applicable to this case, *see* Maryland Courts & Jud. Proc. Code Ann., § 5–101, begin to run and the kind of notice that triggers it. Recent cases have addressed these points. In *Poffenberger v. Risser*, 290 Md. 631, 431 A.2d 677 (1981), the seminal case on the "Discovery Rule", the Court addressed the "nature of the knowledge necessary, under the discovery rule, to start the running of the limitations period." 290 Md. at 636, 431 A.2d 677. Having pointed out that notice could be of two kinds, actual and constructive, and defining them thus:

Actual notice may be either express or implied. If the one, it is established by direct evidence, if the other, by the proof of circumstances from which it is inferable as a fact. Constructive notice is, on the other hand, always a presumption of law. Express notice embraces not only knowledge, but also that which is communicated by direct information, either written or oral, from those who are cognizant of the fact communicated. Implied notice,

which is equally actual notice, arises where the party to be charged is shown to have had knowledge of such facts and circumstances as would lead him, by the exercise of due diligence, to a knowledge of the principal fact,

290 Md. at 636–37, 431 A.2d 677, the Court held:

Affirmatively speaking, we determine the discovery rule contemplates actual knowledge—that is express cognition, or awareness implied from

"knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.... In other words, a purchaser cannot fail to investigate when the propriety of the investigation is naturally suggested by circumstances known to him; and if he neglects to make such inquiry, he will be held guilty of bad faith and must suffer from his neglect.... [citations omitted]

290 Md. at 637, 431 A.2d 677. *See also Lutheran Hospital v. Levy,* 60 Md.App. 227, 237, 482 A.2d 23 (1984), in which we, explicating *Poffenberger,* stated:

Under the discovery rule as stated in *Poffenberger* limitations begin to run when a claimant gains knowledge sufficient to put her on inquiry. As of that date, she is charged with knowledge of facts that would have been disclosed by a reasonably diligent investigation. The beginning of limitations is not postponed until the end of an additional period deemed reasonable for making the investigation.

*O'Hara v. Kovens,* 305 Md. 280, 503 A.2d 1313 (1986) involved the question of whether, and when, the accrual of a cause of action is a question of fact to be determined by the trier of fact. The Court held that where there are questions of fact relating to when the statute of limitations began to run, those questions should be determined, in a jury trial, by the jury and not the trial judge. 305 Md. at 301, 503 A.2d 1313. Although it held that, in that case, the question was one for the jury, it nevertheless recognized

that "the ordinary principles governing summary judgment ... continue to apply when the issue on summary judgment is limitations...." 305 Md. at 304, 503 A.2d 1313. In that regard, the Court observed:

> This argument uses "matter of law" in the sense that reasonable men, on this record and properly instructed as to the applicable law, could not fail to find that the plaintiffs were on notice more than three years before this suit was brought. To decide this question one must know what being on notice means, or could mean, in this case. Notice is not limited to actual knowledge of the fraud. Nor does it mean discovery of proof which, if believed, would, in the opinion of counsel, take the case to the jury on the merits. It is not limited to admissible evidence.

> We have seen ... how being "on notice" means having knowledge of circumstances which would cause a reasonable person in the position of the plaintiffs to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged fraud.

305 Md. at 301–02, 503 A.2d 1313. *See Baysinger v. Schmid Products Co.*, 307 Md. 361, 367–68, 514 A.2d 1 (1986); *DeGroft v. Lancaster Silo Co.*, 72 Md.App. 154, 175, 527 A.2d 1316 (1987).

Our task, then, is to determine, as the trial court recognized, whether, as a matter of law, appellants were on inquiry notice, at some point before September 24, 1981, as to claims which they might have had against appellees.

The cases applying the *Poffenberger* rule in the context of summary judgment demonstrate that mere suspicion or actions which, under the circumstances, may be inconsistent with those of "an ordinary and prudent person", do not automatically render summary judgment an appropriate disposition.

*DeGroft, supra,* is particularly instructive in that regard. DeGroft had a silo built in 1975. He became concerned, some time in 1977, that the silo was leaning and, over the next three or four years, he contacted the builder's repre-

sentatives from time to time regarding his concern. De-Groft was assured by the builder's representatives that nothing was wrong with the silo and that they would "continue to watch it". When, in late 1981 or early 1982, the leaning became more pronounced, he again contacted an agent of the builder. The agent observed the silo, agreed that the silo was leaning, and promised to build DeGroft another silo without cost. DeGroft discovered the cause of the leaning when he emptied the silo and saw cracks in the concrete footing. He filed suit against the builder in 1983. Reversing the trial court's grant of summary judgment in favor of the builder, we said:

> The mere fact appellant knew the silo was leaning in 1977 does not, of necessity, establish that he was aware that a wrong had occurred, nor does the fact he made calls to appellee necessarily indicate he knew appellee was responsible for that wrong, (footnote omitted)

72 Md.App. at 173, 527 A.2d 1316, and that:

> [t]he facts indicate nothing whatsoever about the nature or extent of the leaning in 1977, *i.e.*, whether it was significant or slight, whether obvious or only perceptible from a distance. Nor does the record reveal whether the leaning grew gradually and progressively more severe until 1982, when it concededly leaned drastically, or whether it remained fairly stable and then suddenly and dramatically shifted in 1982. We must assume the latter because the facts and the inferences drawable therefrom are to be reviewed in the light most favorable to appellant.

> It may be that an ordinary and prudent person in appellant's position would have disregarded appellee's assurances that nothing was wrong with the silo and would have undertaken further investigation. And it may be that the nature and extent of the leaning in 1977 or at some point thereafter was so marked that an ordinary and prudent person would have concluded that some fault on the part of appellee might have been the cause of the leaning.

But these were matters for the trier of fact to determine on a record more ample than that before the court on the summary judgment motion. As in *Baysinger, supra,* the evidence presented was simply inadequate to indicate that in 1977 appellant *"then* suspected, or reasonably should have suspected *wrongdoing* on the part of anyone", 307 Md. at 367, 514 A.2d 1 (emphasis added), or to allow us to conclude, as a matter of law, that an ordinary, prudent person would have conducted further investigation.

72 Md.App. at 174–75, 527 A.2d 1316.

    ■ There is present in this case, however, a factor that was not present in any of the earlier cases. Within a short time after the board meeting, the Board made an inquiry of an independent party concerning an issue, which the Board, in its opposition to the Motion for Summary Judgment, asserts was not generated by the matters raised and discussed at the board meeting. And it was, in large measure, the temporal proximity between that board meeting, at which questions arguably demonstrative of the Board's being suspicious of, and deeply concerned about, whether its attorney was, or had been, acting in its best interest, and the initiation of that inquiry upon which the trial court relied in granting Summary Judgment. Moreover, the Blunt affidavit, which appellants allege generates a genuine issue of material fact, does no more than conclusorily state that the Board did not know on September 15, 1981 of any wrongful acts committed by appellees or that appellees might be liable in damages to the bank; it contained no facts from which it could be inferred that there was an independent basis for the Board's inquiry. The question thus presented is whether this factor makes a difference. We think it does and thus hold that the trial court properly granted summary judgment. We will explain.

    ■ Maryland Rule 2–501(b) requires that the non-moving party's response to the Motion for Summary Judgment identify with particularity material facts that are disputed. Appellants contend the Blunt affidavit does precisely that. We do not agree. As we have already observed, that

affidavit, far from providing a basis, not to mention one independent of that suggested by the disclosures at the board meeting of September 15, added nothing germane to the question of limitations before the trial court. Aside from the conclusory statement that the Board did not know of any wrongdoing by its counsel prior to October 29, the only conceivable basis the affidavit suggests for the Board's inquiry was the discovery in late October or early November, 1981 of correspondence between Jackley and Morse, dated November 17, and November 20, 1980. Whether it was discovered in late October or early November, 1981, it was discovered after the Board's inquiry; hence, it cannot be a basis for the inquiry. Nor does the assertion in the affidavit regarding Jackley's failure to report back to the Board, as requested, suffice. That allegation simply lacks the particularity that is necessary to permit the inference that it was that failure, rather than the disclosures made at the board meeting, that prompted the Board's inquiry.

*Geisz v. Greater Baltimore Medical Center,* 313 Md. 301, 545 A.2d 658 (1988) is instructive. Although it did not refer to the requirements of subsection (b) of the summary judgment rule, the court made clear that the mere submission of an affidavit, or other evidence in opposition to a motion for summary judgment, does not ensure that a triable issue of fact will be generated. There, one of the plaintiffs' causes of action sounded in fraud. In response to the defendants' motion for summary judgment, they relied upon the deposition testimony of Dr. Richards, one of the defendants, given in an unrelated case, to generate a dispute of material fact concerning whether that defendant had knowingly made false representations concerning the quality of care available at GBMC. The defendants' purpose was to contrast Dr. Richards' deposition testimony, which was critical of the facilities and staff at GBMC, with the assurances they alleged Dr. Richards gave them concerning the quality of treatment their decedent received at GBMC, which assurances, they further alleged, dissuaded them from seeking treatment at another facility. The plain-

tiffs argued that, when viewed in context, the deposition testimony was "evidence directly and sufficiently creating an inference of knowingly false representations." 313 Md. at 330, 545 A.2d 658. The issue in *Geisz*, as it is here, was limitations. Addressing the argument, the Court of Appeals, concluded:

Certainly, at trial, a jury could accept as true the admissions of Dr. Richards as to the liability issue and reject his explanation that the quality of life of his staff was affected, but not the quality of patient care. The present issue, however, is limitations. To the extent that a triable issue of fraud in the instant matter is dependent on misrepresentations made with knowledge of their falsity, the deposition testimony of Dr. Richards is not sufficient. Even though a jury could reject Dr. Richards's exculpatory testimony, that rejection would not constitute evidence of Dr. Richards's state of mind sufficient to support, by clear and convincing evidence, a finding that his actual belief was contrary to his testimony. Because plaintiffs at trial will have the burden of proving fraud, plaintiffs on summary judgment, even where the defendants are the movants, must demonstrate that fraud is a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)

313 Md. at 330–31, 545 A.2d 658. The court noted in a footnote that

[The *Celotex*] rule assumes that the plaintiff opposing summary judgment has had a reasonable opportunity to utilize discovery. In the present case, the plaintiffs do not contend that they were denied discovery rights.

*Id.* at 331, 545 A.2d 658.

In *Celotex*, the plaintiff sued 15 named corporations for negligence, breach of warranty, and strict liability in connection with the death of her decedent from exposure to asbestos products manufactured or distributed by them. Celotex, one of the named corporations, moved for summary judgment on the grounds that the plaintiff had "failed to produce evidence that any [Celotex] product ... was the

proximate cause of the injury alleged within the jurisdictional limits of [the District] Court." 106 S.Ct. at 2551. In response to the motion, the plaintiff produced three documents which she claimed generated a genuine dispute of material fact concerning whether her husband had been exposed to asbestos products manufactured or distributed by Celotex.[2] The trial judge granted summary judgment; however, the District of Columbia Circuit Court of Appeals reversed, basing its decision upon the principle that "the party opposing the Motion for Summary Judgment bears the burden of responding *only after* the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact." (Emphasis in original) 106 S.Ct. at 2552.

■ The Supreme Court reversed, holding:
We think that the position taken by the majority of the Court of Appeals is inconsistent with the standard for summary judgment set forth in Rule 56(c) of the Federal Rules of Civil Procedure.[3] Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

---

**2.** The documents were a transcript of the deposition of the deceased, a letter from the deceased's former employer, and a letter from an insurance company to defendant's attorney. All of these documents tended to establish that the deceased had been exposed to the defendant's asbestos products. The defendant argued that the documents were inadmissible hearsay and could not be considered in opposition to a summary judgment motion.

**3.** That Rule, which is similar to Maryland Rule 2–501(a) and (e), provides:
The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party, prior to the day of hearing, may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on

entitled to a judgment as a matter of law." In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact", since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

106 S.Ct. 2552–53.

Although the issue here is whether appellants were on inquiry notice, not whether they had failed to make a showing sufficient to establish an essential element of their case, we see no reason why, under these circumstances, the same rule should not apply. Indeed, the Court of Appeals not only recognized the soundness of the rule in *Geisz*, but

---

the issue of liability alone although there is a genuine issue as to the amount of damages.

Moreover, Rule 56(e), which is similar to Maryland Rule 2–501(b) provides:

(e) *Form of Affidavits; Further Testimony; Defense Required.* Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

applied it in a situation involving limitations. Accordingly, we hold that in a case involving limitations, where a Motion for Summary Judgment presents an issue of inquiry notice, the motion is properly granted unless the non-moving party presents evidence of a basis for the inquiry subsequently undertaken, independent of that set out in the showing made by the moving party. In this case, the trial judge correctly granted summary judgment.[4]

2.

As we have seen, appellants filed, in the Morse/Danmor action, a third-party complaint against appellees, virtually identical to the complaint at issue *sub judice*. Appellants argued below, that the applicable statute of limitations was tolled by the third-party complaint. The lower court ruled "that the statute of limitations bars the suit, and ... that the filing of a third-party claim, later dismissed in a separate action, was not generally and did not in this case toll the statute of limitations." Citing proper service, within the limitations period, of the third-party complaint on appellees and, hence, appellees' knowledge of its pendency, and relying upon *Reed v. Sweeney*, 62 Md.App. 231, 488 A.2d 1016, *cert. denied*, 303 Md. 471, 494 A.2d 939 (1975) and *Bertonazzi v. Hillman*, 241 Md. 361, 216 A.2d 723 (1966), appellants here maintain that the ruling was error.

---

**4.** Appellants assert that they could not have been on inquiry notice as to any cause of action against appellees on September 15, 1981 because no cause of action had accrued on that date. We agree with appellees:

... the Board loses sight of the damages actually prayed in this action. The Board claims damages in the amount of $17,000.00 for legal fees paid to Baskin & Sears and for reimbursement of all amounts actually paid to Daniel Morse and Danmor in excess of the FDIC guidelines. These are damages which, if the allegations could be proven, would flow from the two areas of concern addressed in the Hogan & Hartson memorandum. In addition, the right to indemnification for any judgment entered against First Montgomery or its Directors with respect to fees allegedly owed to Morse or Danmor was certainly in existence in September 1981 if the allegations of the Board were ever to be proved in the event of such a judgment.

*See also James v. Weisheit*, 279 Md. 41, 367 A.2d 482 (1977).

■ They posit that the statute of limitations was tolled on January 9, 1984, when the third-party complaint was filed and resumed running in January of 1985, when it was dismissed. The present action, filed on September 24, 1984, was filed, in their view, during the period when the statute was tolled. In essence, appellants' position is that, because the statute of limitations is but "a practicable and a pragmatic 'device' " which protects a defendant from stale and untimely suits, *Reed*, 62 Md.App. at 238, 488 A.2d 1016, where a party has been properly served with, and is therefore aware of, the pendency of an action against it, the purpose of the statute of limitations is satisfied and the statute is tolled.

An argument very similar to that advanced by appellants has been considered and rejected by the Court of Appeals. *See Walko Corp. v. Burger Chef Systems, Inc.*, 281 Md. 207, 378 A.2d 1100 (1977). In *Walko Corp.*, the Court of Appeals addressed the question whether the statute of limitations was tolled while a motion for leave to intervene, ultimately denied, was pending. The Court held that it was not.[5] In so holding, the Court of Appeals recognized "The principle of law was undisputable, when the statute of limitations once begins to run, nothing will stop or impede its operations." 281 Md. at 210, 378 A.2d 1100. It went on to say, in the context of the argument advanced by appellants:

Arguably, appellees were on notice of Walko's claim once the motion to intervene was filed. As we have indicated, however, Walko's approach to this case was hardly one of vigilance. The statute of limitations reflects a legislative judgment of what is deemed an adequate amount of time

---

5. Walko Corp. had sought to intervene in a case pending against Burger Chef. It filed a motion to intervene along with an intervenor's complaint, presumably for use in the event the motion was granted. The motion was denied and Walko Corp. then filed an action against Burger Chef. That action was identical to the cause of action it sought to pursue by intervention.

in which "a person of ordinary diligence" should bring his action. . . . The unexplained delay in bringing a timely action here hardly bespeaks the "ordinary diligence" required of one seeking to toll the statute of limitations. (citations omitted) 281 Md. 215, 378 A.2d 1100.

While it is true that in *Walko Corp.*, there were eleven days remaining in the statute of limitations when the motion to intervene was denied and Walko filed its separate action after that time had expired, while in the instant case, the limitations period expired while appellants' third-party complaint was still pending, the principle enunciated there is nevertheless dispositive of this case. Despite having acquired actual knowledge of potential wrongdoing on the part of their attorney in October 1981 and having been sued by Morse/Danmor in 1983 for damages for which they considered appellees responsible, appellants did not pursue any claim against appellees until July 9, 1984. And they did not file a separate action against appellees until September 24, 1984, two weeks after appellees moved to dismiss the third-party complaint. As in *Walko Corp.*, this hardly seems the kind of diligence which should excuse the running of the statute of limitations.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.