832 A.2d 855

Donald L. TATE

v.

Susan R. TATE.

No. 1931, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Oct. 2, 2003.

526

Steven R. Freeman (Freeman, Wolfe & Greenbaum, P.A., on brief), Towson, for appellant.

James P. Nolan (Kevin M. Schaeffer, Council, Baradel, Kosmerl & Nolan, P.A., on brief), Annapolis, for appellee.

Argued before HOLLANDER SHARER MOYLAN, and CHARLES E., JR. (retired, specially assigned), JJ.

MOYLAN, J.

This dispute between the appellant, Donald L. Tate, and the appellee, Susan R. Tate, is over their respective entitlements

to certain funds owing, as of July 1, 1999, to one or both of them by a partnership in which each owned a 25% interest.[1]

On October 21, 1999, Donald Tate filed a Complaint for Declaratory Judgment in the Circuit Court for Anne Arundel County, asking that court to declare that he had exclusive entitlement to the disputed funds. Numerous depositions and other documents were filed. Extensive discovery was conducted. After the filing of a Motion for Summary Judgment by Donald Tate and a Counter Motion for Summary Judgment by Susan Tate, Judge Philip T. Caroom filed a seven-page Opinion and Order as to Declaratory Relief and Related Matters on Summary Judgment. That Opinion declared that twice the amount of the disputed funds in question was owed by Severn Valley to Donald Tate and to Susan Tate in equal amounts, in effect granting summary judgment in favor of Susan Tate as to her one-half share of that amount. Donald Tate has brought the present appeal.

The appellant and the appellee were married on April 9, 1960, and separated more than thirty years later on October 4, 1990. They were divorced in the Circuit Court for Anne Arundel County on November 5, 1993. A comprehensive Voluntary Separation and Property Settlement Agreement, also dated November 5, 1993, was approved and incorporated into the Judgment of Absolute Divorce.

The partnership in question was the Severn Valley Farms LLC ("Severn Valley"). The partnership was initially formed in 1985, when Donald Tate and Baldwin Enterprises, Inc. purchased two parcels of real property in Anne Arundel County. Both Donald Tate and Baldwin Enterprises initially became 50% owners of Severn Valley. The ownership of the partnership changed in 1987, however, when by virtue of an Agreement of General Partnership, Donald L. Tate and Susan R. Tate each became the owner of a 25% interest in Severn

---

1. Troese Title Services, Inc., the escrow agent for the disputed funds, was initially named as a party but has been released, having no independent claim, and has taken no part in the proceedings below or in this appeal.

Valley. Baldwin Enterprises retained its 50% ownership interest.

Both parties to this appeal agree that the reason for making Susan Tate a partner in Severn Valley was because Donald Tate had received and approved the recommendation of his lawyers that the new arrangement would be advisable "for estate planning purposes." The agreement making Susan Tate a partner was backdated to June 1, 1985. During the remaining years of the Tates' marriage, Susan Tate's involvement in partnership decisions was exclusively a passive one. As Judge Caroom's Opinion declared, "The wife was present when some discussions were held between the original partners, but she did not participate or pay much attention."

The funds in dispute in this case were initially part of the assets of Severn Valley acquired on July 1, 1999, when Severn Valley sold a tract of real property in Anne Arundel County to Winchester Homes, Inc. for approximately $4,000,000. From those assets, Severn Valley was to "repay" its partners, with interest, for certain payments into Severn Valley which had earlier been made by its partners. As far as the Tates were concerned, four such payments were in issue, payments made to Severn Valley on behalf of one or both of the Tates 1) in October of 1988 for $39,500; 2) on October 25, 1989 for $34,500; 3) on August 25, 1992 for $72,772.66; and 4) on September 21, 1993 for $15,910.50. The full amount of those loans, plus accrued interest, came to $468,774.76. Donald Tate claimed that that full amount was owed by Severn Valley exclusively to him. Susan Tate maintained that one-half of that amount, $234,387.38, was owed by Severn Valley to her.[2]

To protect her interest in the claimed $234,387.38, Susan Tate, as a 25% partner in Severn Valley, informed Donald

---

**2.** The record does not establish with absolute certainty which precise payments on which precise dates added up to, with accrued interest, the $468,774.76 owing from Severn Valley to one or both of the Tates on July 1, 1999. Everyone agreed, however, that that was the amount. If, in our narrative of background facts, we have erroneously added a payment, left out a payment, or misdated a payment, that narrative lapse will not affect our ultimate legal resolution of the case.

Tate that she would not agree to the sale of the real property to Winchester Homes, Inc., unless he agreed to place that amount in escrow at settlement from his portion of the proceeds. Accordingly, he placed that amount in escrow. The entitlement to those funds represents the sole issue that was before Judge Caroom.

## The Denial of Summary Judgment
## in Favor of Donald Tate

On the books of Severn Valley, all of the payments made to Severn Valley by either of the Tates were recorded as "loans" made to Severn Valley by Donald Tate. On the basis of those bookkeeping entries, Donald Tate contends that Judge Caroom erroneously failed to grant summary judgment in his (Donald Tate's) favor. He claims that Paragraphs 5d and 20G of the November 5, 1993, Voluntary Separation and Property Settlement Agreement are dispositive as to property "titled in his own name." Section 5d of the Agreement provided:

"Except as otherwise provided in this Agreement, *each party shall retain, as his or her sole and separate property,* any stocks, bonds, or other securities, savings or checking accounts, certificates of deposit, money market funds, pensions, profit-sharing plans, individual retirement accounts, deferred compensation of any kind, and *any other assets of any kind or nature in his or her own name,* free and clear of any interest of the other."

(Emphasis supplied). Section 20G of the Agreement provided:

"Except as otherwise provided in this Agreement, the parties agree that *any property titled in the name of a party shall remain the sole property of that party,* free from any claim of the other party."

(Emphasis supplied).

Judge Caroom ruled that those sections of the Agreement were not dispositive in Donald Tate's favor because 1) the meaning of § 5d's "in his name" did not embrace the characterization made by a third-party bookkeeper and 2) the book-

keeping entry was not a sufficient "instrument" to confer legal title.

The husband's primary basis for retaining the disputed SVF loan funds is this: once the settlement agreement resolved the parties' marital property issues, it also provided that "... [E]ach party shall retain, as his or her sole and separate property, any ... assets of any kind or nature in his or her name, free and clear of any interest of the other."

*What does "in his ... name" mean?* Interestingly, the phrase does not appear in Black's Law Dictionary (7th Ed.1999). Maryland appellate case law is full of references to this phrase, but over 90% of these are coupled with the more specific qualification "titled in the name" or "indorsed in the name," etc., referring a specific legal designation.... This Court takes note that other usage of the phrase may be more equivocal; for example, someone might say, "Osama Bin Laden may not be held criminally responsible simply because an offense was committed in his name" or "The neighborhood association's board agreed the treasurer could keep the funds in his own name, but for the benefit of the association." Given these various possible uses, *the undersigned concludes that in itself the phrase is ambiguous and must be construed from context and any appropriate extrinsic evidence.*

Because SVF never asked [for] or obtained from the wife any contribution when needed for the loan accounts, and because SVF carried the funds on its ledgers in his name alone, the husband contends that these "accounts" must remain his sole legal property. However, *the undersigned is persuaded that SVF's characterization of these funds is not decisive and does not represent "title" ownership of the disputed funds.* "Title" is defined by Black's, *supra,* as

1. The union of all elements (as ownership, possession, and custody) constituting the legal right to control and dispose of property; the legal link between a person and the property itself.... 2. *Legal evidence of a person's ownership rights in property; an instrument (such as a deed) that constitutes such evidence.*

*The ledger certainly is not an "instrument" in the legal sense of that word.* As evidence, it would be hearsay (notwithstanding the business records exception), not emanating from someone with personal knowledge; therefore, as extrinsic evidence, its corroborative value is weak.

(Emphasis supplied).

The various depositions that had been submitted to Judge Caroom indisputably supported his conclusion that neither Donald Tate nor Susan Tate had ever given any instruction to the bookkeeper as to how the payments from the joint checking account of Donald and Susan Tate were to be recorded or characterized, notwithstanding that the checks were signed by Donald Tate.

Rather, the strongest evidence of the parties' intent must come from the parties themselves. Here, *neither Baldwin nor his bookkeeper recall any explicit instructions from either the husband or the wife as to how these funds should be treated.* The wife confirms·that she never gave any such instructions because she was hardly aware of the transactions by which that the funds were being paid into SVF. *The husband also never gave any instructions as to how these funds should be treated;* see his deposition, attached to Defendant's Opposition to . . . [Second] . . . Summary Judgment and . . . Counter–Motion . . ., exhibit A, *("Q: Did you, or had you previously told [SVF] to do that, i.e., to carry the notes or the payments strictly as notes payable to you? A: I didn't instruct them at all. Q: So you had nothing to do with how [SVF] carried those payments on its books? . . . A: I did not.") Indeed, neither party had even seen the SVF account ledger books prior to the litigation,* although each had the right of access to these as partners.

(Emphasis supplied).

At stake was approximately half a million dollars held by the Severn Valley partnership for one or both of the Tates, each a 25% partner in Severn Valley. Rather than accepting a strained reading of the general and boilerplate language of a subsection, to wit, 5d, of § 5, dealing with "PERSONAL

PROPERTY;" or a subsection, to wit, 20G, of § 20, dealing merely with "MISCELLANEOUS," Judge Caroom looked to the larger context of the Property Agreement in its totality and to the specific provision of § 19, spelling out precisely the equal interests of Donald Tate and Susan Tate in the Severn Valley partnership. *Mattingly Lumber Co. v. Equitable Bldg. & Savings Assoc.*, 176 Md. 403, 408, 5 A.2d 458 (1939). The Property Settlement Agreement of November 5, 1993, contained, as § 19, the one very specific provision that covered the respective interests of the appellant and the appellee in the Severn Valley Farms Partnership.

"Husband and Wife are each owners of a separate twenty-five percent (25%) interest in the Severn Valley Farms Partnership which owns real property located in Anne Arundel County, which is currently being developed. From the date of this Agreement, each party shall be solely responsible for the capital and any other monetary contributions required on account of his or her respective twenty-five percent ownership of the Severn Valley Farms Partnership."

We hold that Judge Caroom was not in error in declining to grant summary judgment, on the basis of §§ 5d and 20G of the Property Settlement Agreement, in favor of Donald Tate.

### An Alternative Rationale

Judge Caroom actually supplied a tentative "backstop" or alternative rationale supporting his ruling. We note initially that the disputed funds owing from Severn Valley to the Tates (twice the amount placed in escrow) totaled almost half a million dollars. This was self-evidently no *de minimis* asset. In the course of the divorce litigation, Donald Tate submitted to Susan Tate his S74 Financial Statement. It did not identify the disputed $468,774.76 as his property or refer to it as an asset belonging to him. At another point in the divorce litigation, Donald Tate submitted to Susan Tate a previously prepared financial statement, which again failed to identify the $468,774.76 as his property or to refer to it as an asset belonging to him.

In his deposition, Donald Tate acknowledged these failures and simply stated, "I overlooked them." When pressed, he explained:

"It was overlooked as an asset. * * * Well, I prepared financial statements all my business life and these never appeared on there and I can't explain why. Just I overlooked it as an asset."

That oversight contrasts significantly with § 10 of the Property Settlement Agreement, entitled "TATE NOTES," in which the appellant, over the course of six and one-half pages, provides precise details as to other comparable assets. Indeed, it was not until the settlement on July 1, 1999, that Donald Tate advised Susan Tate, for the first time, that he was viewing the entire $468,774.76 in the hands of Severn Valley as his sole property.

As a "backstop" rationale for his ruling, Judge Caroom took a dim view of this massive non-disclosure.

Arguably, if the parties' agreement were construed not to have expressed this intent, *the Court would be left with another question of whether the wife should be entitled to a constructive trust, or to reformation of the parties' agreement, due to their mutual mistake in omitting a material item of marital property from consideration.* Such a remedy indeed properly would have been available to the wife. The wife, by counsel, alleges that such a remedy should be permitted, despite the final divorce judgment due to the husband's fraud in omitting reference to the SVF loan funds from his financial statements and discovery. The undersigned finds that these allegations are only conclusory. Cf., *Bennett v. Baskin & Sears,* 77 Md.App. 56, at 70, 549 A.2d 393 (1988). *While the undersigned does not find that fraud is supported by the undisputed evidence herein, it is not needed for the relief sought.*

*Mutual mistake, under Maryland law, is a sufficient basis for reformation of a contract to supply provisions omitted by oversight.* Here, there is no dispute but that neither party recalled the existence of the funds until they

sat down at the settlement table when their SVF interests were sold in 1999. As Justice Story once said,

> [a] court of equity would be of little value ... if it could suppress only positive frauds, and leave mutual mistakes, innocently made, to work intolerable mischiefs contrary to the intention of the parties. It would be to allow an act, originating in innocence, to operate ultimately as a fraud by enabling the party, who receives the benefit of the mistake, to resist the claims of justice under the shelter of a rule framed to promote it ... Equity reforms an instrument not for the purpose of relieving against a hard or oppressive bargain, but simply to enforce the actual agreement of the parties to prevent an injustice. . . .

Quoted in *Housing Authority v. Macro Housing,* 275 Md. 281, at 286–287, 340 A.2d 216 (1975).

Moreover, *the undersigned would find that the husband's negligence in omitting reference to SVF loan funds amounted to "gross negligence"* as it violated his obligations not only under Maryland Rule 9–203(g), 9–206 and discovery, but also his fiduciary duty as the dominant financial party in the marriage upon whom the wife clearly relied. Thus, *even under the terms of the parties' agreement, the wife would be entitled to seek reformation of the agreement to seek the relief sought.*

(Emphasis supplied).

### The Disposition of This Case Did Not Turn On Interpreting Terms of a Contract

█ In reviewing the propriety of Judge Caroom's 1) denial of summary judgment in favor of Donald Tate and 2) grant of summary judgment in favor of Susan Tate, we decline to be confined within the analytic box framed by the appellant's configuring of his contentions. Judge Caroom's declaration as to the ownership of the escrowed funds did not depend upon some finding by him that the terms of the 1993 Property Settlement Agreement were ambiguous. His review of the undisputed evidence before him was not, in turn, a resort to extrinsic evidence to resolve an ambiguity in one or more terms of the Agreement.

The resolution of this case did not turn on either the plain meaning of the words "in his name" in § 5d of the Agreement or on what the Tates intended those words to mean. The resolution of this case did not turn on either the plain meaning of the words "titled in the name of a party" in § 20G of the Agreement or on what the Tates intended those words to mean.

The unmistakable purport of Judge Caroom's Opinion and Order was that §§ 5d and 20G, however clarion their meaning, simply did not apply to the escrowed funds owed by Severn Valley on July 1, 1999, to one or the other of the Tates. Notwithstanding the appellant's framing of his contentions, we decline to get mired down in an immaterial body of caselaw dealing with finding and resolving ambiguities in the terms of a contract. Judge Caroom's final declaration did not depend on interpreting terms of the Agreement but on the legal significance of extrinsic events involving the partners and the Severn Valley partnership.

> [T]he funds held in escrow constitute a part of the equal interest in the Severn Valley Farm partnership which was given by Plaintiff to Defendant pursuant to the parties' separation agreement.

The meaning of § 19 of the Agreement, recognizing Donald Tate and Susan Tate as equal 25% partners in Severn Valley, was never in question. It is clear that the Tates intended for the very specific provisions of § 19 of the Property Settlement agreement to cover their respective interests in the Severn Valley partnership, without any necessary reference to other more general, miscellaneous, and boilerplate provisions of the Agreement. There was no ambiguity with respect to § 19, and nothing that was declared by Judge Caroom suggested that there was.

### Payments Were Made to the Partnership By the Total, 50%, Tate Interest In the Partnership

The $468,774.76 owed by Severn Valley to the Tates on July 1, 1999, was the result of the four payments, plus accrued

interest, made by the Tates into Severn Valley between 1987 and 1993. Although Donald Tate would prefer to phrase it otherwise, the critical question is not BY WHOM those payments were made, but ON BEHALF OF WHOM those payments were made.

It was undisputed that from the time she was made a 25% partner in Severn Valley in 1987 (backdated to 1985) until the final dissolution of the marriage in 1993, Susan Tate was essentially a passive partner. Thomas Baldwin, the managing partner,[3] continued, after 1987, to deal with the collective 50% Tate family interest exclusively through Donald Tate. All communication between the managing partner and the combined Tate family interest in the partnership was through the medium of Donald Tate. All requests for payments to the partnership—whether they be characterized as "cash calls," requests for capital contributions, or requests for loans—were directed to Donald Tate. All statements showing the financial situation of the partnership were sent to Donald Tate. As Judge Caroom declared from the undisputed facts:

> [B]etween 1985 and 1993, SVF continued to issue tax documents *in the husband's name only* and to issue requests for financial contributions *in the husband's name only. The husband made payments to SVF,* in response to the requests for financial contributions, *by using the parties' joint checking account.*

(Emphasis supplied).

The mere fact that all communications between the managing partner, on behalf of Severn Valley, and the full 50% Tate family interest in the partnership, representing Donald Tate's 25% share and Susan Tate's 25% share, came through the physical medium or agency of Donald Tate is not at all dispositive of the critical question of whether Donald Tate's responses, particularly to the requests for payments, were 1)

---

**3.** The 50% interest in Severn Valley other than the collective Tate family interest was in the name of Baldwin Enterprises, Inc. Thomas Baldwin, the managing partner, sometimes acted in his own name personally and sometimes in the name of Baldwin Enterprises, Inc. For purposes of this opinion, they are one and the same.

on his own personal behalf, acting as a single 25% partner; or 2) on behalf of himself and Susan Tate, acting as the representative of the combined 50% Tate family interest in the partnership.

For purposes of this appeal, Donald Tate refers to the three or four critical payments made to Severn Valley as "loans," rather than as "cash calls" or "capital contributions." Even if he were to prevail with respect to this characterization of the payments, it would by no means be dispositive of the larger issue in his favor. Although, to be sure, Donald Tate signed the checks by which payment was made, the monies paid came out of the joint checking account of Donald and Susan Tate. The "loans" to Severn Valley, if they were such, might readily have been by Donald Tate personally. They might as readily, however, have been made to Severn Valley on behalf of both Donald and Susan Tate, representing the full 50% Tate interest in the partnership, notwithstanding that the payments were made through the physical agency of Donald Tate.

That question did not have to be decided, however, because the undisputed evidence established that the payments were not "loans," but were capital contributions made in response to "cash calls" issued on behalf of Severn Valley by managing partner Thomas Baldwin. Judge Caroom properly discounted the evidentiary significance of the fact that Severn Valley "carried the funds on its ledgers in [Donald Tate's] name alone." As we have already discussed in another legal context, Judge Caroom declared that the undisputed evidence showed that

> *neither Baldwin nor his bookkeeper recall any explicit instructions from either the husband or the wife as to how these funds should be treated. The wife confirms that she never gave any such instructions* because she was hardly aware of the transactions by which the funds were being paid into SVF. *The husband also never gave any instructions as to how these funds should be treated.*

(Emphasis supplied).

Judge Caroom quoted from Donald Tate's deposition of July 5, 2001.

Q  Did you, or *had you previously told Severn Valley Farms* to do that, i.e., *to carry the notes or the payments strictly as notes payable to you?*

A *I didn't instruct them at all.*

Q  *So you had nothing to do with how Severn Valley Farms* did its bookkeeping or accounting or *carried those payments on its books;* is that correct?

MR. WOLFE: Objection. You can answer.

A *I did not.*

(Emphasis supplied).

The evidence was indisputable that the payments in question were not "loans" by Donald Tate. Had there been "loans" made to Severn Valley, either by Donald Tate individually or by Donald and Susan Tate collectively, the debts consequently owed by Severn Valley to one or both of the Tates would have been substantial assets, ultimately worth, with accrued interest, nearly half a million dollars. It is almost inconceivable that, in preparing two separate and otherwise thoroughly detailed financial statements in the course of the divorce proceedings, so substantial an asset was not included, if it in fact existed. Donald Tate's casually dismissive explanation, "I simply overlooked an asset," is not genuinely significant evidence to the contrary.

Throughout the pleadings, Donald Tate continuously referred to "notes" payable to him from Severn Valley in return for the "loans" he had made. No such "notes," however, were ever submitted to Judge Caroom. There was the vaguest of allusions to the fact that they had been lost. Donald Tate, moreover, never listed any references to such notes. In his deposition of July 5, 2001, the following exchange took place:

Q  Okay. *Do you have any financial statements* or copies of them that you prepared at any time during your lifetime, your own personal financial statements *where you show the disputed amount of monies here as loans payable to you by Severn Valley Farms?*

A *I do not.*

(Emphasis supplied).

Even the undocumented assertion that there had once been such notes is, in effect, belied by Donald Tate's deposition testimony on July 5, 2001.

Q When did you first become aware that the notes were recorded separately and [held] in your name, Mr. Tate?

A When I received this October 15, 1998 statement from Severn Valley Farms.

. . . .

Q ... [W]as that the first time that you became aware of the fact that Severn Valley Farms was carrying certain of the prior payments as strictly notes payable to you?

A That's correct.

Q You had no knowledge of that prior to receiving that October 15, 1998 Severn Valley Farms statement; is that correct?

A That's the first time I became aware of it.

The evidence, which we are about to discuss, that the payments in question were capital contributions is further evidence that those payments were not "loans."

An appreciation of the nature of the payments or advances or "cash calls" made by the partners to Severn Valley can best be had by looking at § 6E of the Partnership Agreement dealing with "Capital Contributions."

"E. *Additional funds as determined by the Partners to be required* for the conduct of the business of the Partnership, *shall be contributed by the Partners* in cash to the capital of the Partnership within fifteen (15) days of the written determination thereof *in proportion to their respective Percentage Interests as of the date of such determination."*

(Emphasis supplied).

In her deposition of July 5, 2001, Susan Tate indicated that she, although not participating in the detailed operation of the partnership, was aware of the overall arrangement. She was

aware that statements, to wit, requests for money, were periodically submitted by Thomas Baldwin indicating how much money was due to Severn Valley from Donald Tate and Susan Tate combined. The amount of such requests, moreover, was determined by the bills that Severn Valley received and that needed to be paid.

A All I recall of *the statements* is that they *would say how much money we owed* and then *there would be copies attached [of] bills from engineering firms usually or some other*—they would attach the basis for the amount of the bill.

(Emphasis supplied).

That understanding was completely compatible with § 6E's provision that cash calls for capital contributions by the partners would go out as "additional funds" were "required for the conduct of the business of the Partnership." The reference to "how much money we owed," moreover, was completely in line with § 6E's provision that the additional funds "shall be contributed by the Partners ... in proportion to their respective Percentage Interests" in the partnership.

For two of the payments in dispute, Judge Caroom had before him, as exhibits F and G, the actual cash calls sent out by Thomas Baldwin to Donald Tate. The cash call that resulted in the payment of $39,500 in October of 1988 went out on September 14, 1988. It reflected that two mortgage payments by Severn Valley would come due on October 25, 1988, in the total amount of $78,865.99. Accordingly, both 1) Donald Tate and 2) Baldwin Enterprises, Inc. were asked to make capital contributions in equal amounts of $39,500 each. These requests were under the heading of "Due from Partners," with the further notation that the monies "must be in the bank by October 21."

In an indistinguishable format, the cash call that resulted in the payment of $34,500 on October 25, 1989, went out on September 11, 1989. It reflected that two mortgage payments by Severn Valley would come due on October 25, 1989, in the total amount of $74,297.37. Accordingly, both 1) Donald Tate

and 2) Baldwin Enterprises, Inc. were asked to make capital contributions in equal amounts of $34,500 each. These requests were again under the heading of "Due from Partners."

Both sets of capital contributions were self-evidently pursuant to the provisions of § 6E of the Partnership Agreement dealing with "Capital Contributions." The "cash calls" that led to the capital contributions in question were, in accordance with § 6E, made in equal amounts to 1) Baldwin Enterprises, Inc., representing a 50% partnership interest, and to 2) Donald Tate. Self-evidently, the "cash call," albeit addressed to Donald Tate, was made on and the consequential capital contribution was made by the Tates collectively, representing a combined 50% partnership interest acting through the agency of Donald Tate. It is inconceivable that Donald Tate, only required to advance money to the partnership in proportion to his percentage of ownership of the partnership, would, if acting exclusively on his own behalf, have advanced twice his proportionate share of the shared obligation.

The payments of $39,500 in October of 1988 and $34,500 on October 25, 1989, by checks signed by Donald Tate but out of the joint checking account of Donald and Susan Tate, each represented a full 50% of what on those respective occasions were "Due from Partners." Each payment satisfied what was due not only from Donald Tate's 25% partnership interest but also from Susan Tate's 25% partnership interest.

It is not plausible that Severn Valley, during all of the years from 1987 to 1993, would have failed to ask Susan Tate, a 25% partner, for any capital contribution whatsoever. As Donald Tate states in his appellate brief, "Prior to December, 1993, there were no written or oral requests made by SVF or by Thomas Baldwin for Susan Tate to pay monies to SVF and she never did." After the divorce of the Tates in 1993, written requests were regularly made to Susan Tate, in her own name, to make loans or advances to Severn Valley in proportion to her ownership interest. She made such loans and had them repaid with interest at the 1999 settlement.

It defies common sense that, as a 25% partner, Susan Tate had been given a free ride prior to 1993. When funds were needed for the benefit of the partnership, 25% of the partnership interest would not be ignored, particularly in view of § 6E of the Partnership Agreement stating that calls would not be made on the partners in proportion to their percentage of ownership in the partnership. It is self-evident that Susan Tate was, indeed, called upon to make her proportionate contribution either 1) by being called on directly or 2) by being called on indirectly through the agency of her husband. That Severn Valley called upon her through the latter modality rather than through the former does not indicate that she was not called upon.

It is clear that the payments made into Severn Valley between 1987 and 1993 were capital contributions by the partners and not "loans." It is equally clear that, throughout those years, Susan Tate's 25% interest in the partnership was as fully paid up, in response to all cash calls, as were Donald Tate's 25% interest and Baldwin Enterprise's 50% interest. Indeed, Judge Caroom's Opinion and Order declared that the "financial contributions" were "in response to cash calls."

As Judge Caroom further declared in his Opinion and Order, § 19 of the Property Settlement Agreement, by providing that from November 5, 1993, forward, "each party shall be solely responsible" for capital contributions in response to cash calls "on account of his or her respective twenty-five per cent ownership" of Severn Valley, gave rise to the implication that prior to that date Donald Tate had undertaken the responsibility for making those capital contributions on behalf of his wife.

[T]he husband treated these funds as part of the entire partnership property eventually to be sold. Finally, the parties' separation agreement as to SVF specifies "From the date of this agreement, each party shall be solely responsible for the capital and any other monetary contributions required on account of his or her respective twenty-five percent ownership of the SVF." By implication, *prior* to that date, the wife was *not* responsible for such contribu-

tions and the husband by default was responsible. Significantly, the same paragraph does not limit its reference to the wife's "interest" or obligation to "capital" assets [but] adds "other monetary contributions."

The ineluctable conclusion is that Susan Tate's 25% obligation for all capital contributions to Severn Valley was fully paid up. Whether the modality of payment was, as seems more likely, 1) by Donald Tate's having acted, prior to 1993, on her behalf or 2) by Donald Tate's having periodically made gifts to her as he satisfied the cash calls implicitly being made on her 25% share of the partnership, the result is the same. Twenty-five percent of the capital contributions were attributable to her, just as 25% of the contributions were attributable to Donald Tate.

As at least a partial rationale, Judge Caroom relied on the gift theory.

Construing the parties' agreement in this context and in light of all these statements by the husband, the undersigned finds that the parties implicitly had agreed that, at least prior to the date of the separation agreement, the wife would be entitled to an equal share of all the husband's SVF assets, capital or otherwise.

This reading of the parties' agreement also comports with the Maryland law as to gifts between husbands and wives. Maryland appellate courts have held that a gift may be found where circumstances indicate that the transfer has been made unconditionally and permanently, effectively waiving marital property claims to that property. The undersigned finds that the "estate planning" explanation makes it clear that this was permanent and that the state recording of the SVF documents, even prior to the parties' separation agreement, makes the unconditional aspect clear. Collectively, the undersigned finds that all the evidence presented herein points to the conclusion that the husband's instructions to Baldwin as to dividing equally with the wife of his SVF ownership constituted such a gift. This eventu-

ally was confirmed by the terms of the parties' separation agreement.

The gift theory, ironically, amounts to a case of Donald Tate's giving gifts to his wife out of their joint bank account. By either rationale, however, Judge Caroom's conclusion was unassailable that the undisputed evidence showed that Susan Tate, as a 25% partner in Severn Valley, was entitled to the $234,387.38 being held in escrow.

Indeed, once it was settled beyond genuine dispute that the payments that underlay this controversy were capital contributions in response to cash calls rather than personal loans, the resolution of the ultimate issue was clear. If the cash call had been made to Susan Tate directly, she, in order to keep her 25% partnership interest in good standing, would have had equal access to the joint account that Donald Tate used to keep his 25% partnership interest in good standing. It would have made no sense whatsoever for Donald Tate, when he received a cash call, obviously for both his 25% interest and his wife's 25% interest, to have paid double the amount requested for his 25% share and nothing for the amount requested for his wife's 25% share. He obviously did no such thing. Thomas Baldwin treated the two Tate family shares in the partnership as an entity and made cash calls on both with a single billing. Donald Tate responded accordingly.

It is equally absurd to suggest that if Susan Tate had directly paid her share of the partners' obligation out of her joint checking account, she would have received full credit for the payment; but that if Donald Tate had satisfied his wife's obligation by remitting on her behalf precisely the same amount of money from precisely the same checking account, she would receive no credit. It is obvious from the amount of his payments that he satisfied both obligations.

The bottom line is that as of July 1, 1999, Susan Tate's 25% interest in Severn Valley was fully up-to-date in response to all cash calls that had been made on the partners for capital contributions and she was, therefore, fully entitled to whatever reimbursement or other distribution of funds Severn Valley

was going to make to its partners in amounts proportionate to the percentage interest of each partner.

## Taking Narrative Notice of the Divorce

■ The appellant also complains that Judge Caroom considered matters outside the record when he "took notice" of his own file in the parties' divorce litigation. The very core of the record in this case, of course, was 1) the absolute divorce of November 5, 1993; and 2) the Voluntary Separation and Property Settlement Agreement of the same date. Also before Judge Caroom, as a significant part of the record, were the financial statements submitted by Donald Tate to Susan Tate in the course of the divorce proceedings.

In the opening paragraphs of his Opinion and Order, Judge Caroom recited:

> *The Court takes notice of its own file* no. C1992–08103 *as to the parties' divorce litigation.* In that matter, the wife alleged and the husband admitted that his income and earnings from assets exceeded $300,000 in 1992. The wife also alleged that she was unemployed and could not afford to maintain the "considerably affluent standard of living" established by the parties during their marriage. While the husband formally did not admit these latter allegations, he agreed to provide her with title to the family home, 25% of his interests from Tate Engineering, as well as a substantial amount of other assets in corporate stocks, other property and cash. Exhibit 19. They were divorced by this Court's judgment of November 5, 1993 in the aforementioned litigation.

(Emphasis supplied).

"Taking notice" of the divorce file was simply narrative background. It was nothing more than an acknowledgment of the judge's recognition that the case before the court has some litigational history. There is no indication that Judge Caroom turned to and considered the substance of any of the pleadings, memoranda, admissions, or other documents in the divorce file in order to resolve the current matter. If either

party objected to the fact that Judge Caroom had apparently presided at the divorce proceeding, that party could have moved to have Judge Caroom recuse himself in the current matter. There was no such motion for a recusal.

The appellant does not even suggest how he might have been prejudiced. Even assuming, *arguendo*, that the judicial blindfold was not tightly tied, the appellant cannot prevail absent some showing of prejudice. *Beahm v. Shortall,* 279 Md. 321, 330–31, 368 A.2d 1005 (1977); *Myers v. Estate of Alessi,* 80 Md.App. 124, 140, 560 A.2d 59 (1989). This lack of any conceivable prejudice is especially clear in a summary judgment case. The trial judge does not assess credibilities or engage in fact-finding of any sort. He decides the case purely as a matter of law and the appellate court makes its own independent judgment as to that legal decision.

In short, Judge Caroom's taking notice of the divorce file had about as much impact as if he had taken notice that the weather outside was threatening or that political trouble seemed to be brewing in the Middle East. Such notice may have been outside the record, but what difference does it make? Obviously, none! A courtroom is not a Trappist monastery and every gratuitous expression is not a sanctionable lapse.

### Judicial Musings Are Not Judicial Actions

■ Judge Caroom observed, quite convincingly, that *if* Susan Tate had not prevailed on the issue of her entitlement to the disputed funds held in escrow, she *might* nonetheless have been entitled to either 1) a constructive trust or 2) a reformation of the Property Settlement Agreement. Because Susan Tate did prevail on the primary merits, however, those contingent possibilities never got beyond their expression in the subjunctive mood.

The appellant claims that it was error for Judge Caroom even to have discussed such possibilities. Even if that were true, obviously no prejudice to the appellant resulted because those speculative possibilities never came to pass. If a sen-

tencing judge were to say to a convicted criminal defendant, "On this evidence you might well deserve the gas chamber, but I am only going to sentence you to ten years in prison," we obviously do not haul out the elaborate machinery of capital punishment legal analysis to probe the judge's thought processes for hypothetical error. Appellate review is only concerned with "what is" and not with "what might have been."

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**