834 A.2d 170

Jeffrey **SUPIK**, et ux.,

v.

**BODIE, NAGLE, DOLINA, SMITH & HOBBS, P.A.**, et al.

No. 1697, Sept. Term, 2002.

Court of Special Appeals of Maryland.

Oct. 29, 2003.

Alan J. (Belsky, Weinberg & Horowitz, L.L.C. on the brief), Baltimore, for appellant.

Janet A. MacDonald (Charles Martinez, Eccleston & Wolf on the brief), Baltimore, for appellee.

Argued before ADKINS, KRAUSER and SHARER, JJ.

SHARER, Judge.

In this legal malpractice case, the Circuit Court for Baltimore County granted summary judgment in favor of appellees, ruling that the negligence claim of appellants, Jeffrey Supik and Shirley Supik, was time-barred by Maryland's three-year statute of limitations.

On March 31, 2000, the Supiks filed a legal malpractice action against their former attorneys, Thomas Dolina, Michael Smith, and Kelly Koermer, and the law firm by which they were employed, Bodie, Nagle, Dolina, Smith & Hobbs, P.A.[1] The Supiks had retained Bodie, Nagle in 1993 to represent them in a toxic tort action against several pest control companies, and in an action against their homeowners' insurer regarding the terms of coverage related to the damages caused by the toxic tort. On the recommendation of Bodie, Nagle, the Supiks settled with all of the defendants in that case. The crux of the legal malpractice case is that, after the settlements, the Supiks came to believe that they had settled the toxic tort case against the pest control companies for less than full value. The Supiks filed a claim against appellees alleging, among other things, professional negligence, breach of fiduciary duty, negligent misrepresentation, and fraudulent misrepresentation.

Following the completion of discovery, Bodie, Nagle moved for summary judgment on the basis that appellants knew, or reasonably should have known, about the negligent representation prior to March 31, 1997. Therefore, appellees argued that Maryland's three-year statute of limitations on legal malpractice barred the action. The trial court agreed.[2]

Appellants have presented us with one question:

---

1. For the sake of clarity, we shall refer to the law firm defendants, now appellees, as "Bodie, Nagle."

2. We have not overlooked our opinion in *Vogel v. Touhey*, 151 Md.App. 682, 828 A.2d 268 (2003), in which we held that a litigant who had accepted a settlement of her claims was precluded from recovery, in a subsequent malpractice action against her attorney, by the doctrine of

Did the trial court err in granting the motion for summary judgment on the grounds that the statute of limitations accrued more than three years prior to the filing of appellants' complaint?

We answer "Yes," because a legal cause of action did not arise until the Supiks settled the underlying tort case, as that event fixed the date of their injury. Moreover, to the extent that a cause of action might have arisen prior to the date of settlement, the question of limitations in this case is one of fact; thus, it was error for the court to grant summary judgment.

## FACTUAL and PROCEDURAL BACKGROUND

Jeffrey and Shirley Supik, appellants, own property at 3523 and 3525 North Rolling Road in Baltimore. On March 17, 1993, the Supiks retained Bodie, Nagle to represent them in toxic tort litigation stemming from their alleged exposure to chlordane[3] that was applied on their property in 1980 and 1981. The toxic tort litigation, filed August 5, 1994, involved claims against two companies, B & B Exterminators, Inc. and its successor in interest, Home Paramount Pest Control Company. The Supiks also sued their homeowners' insurer, American Insurance Company (a subsidiary of Fireman's Fund Insurance Company), as a result of a dispute about the extent of coverage provided by their policy.

Most of Bodie, Nagle's representation of the Supiks occurred in 1995, 1996, and early 1997. Throughout the representation, the Supiks relied on the advice of Bodie, Nagle pursuant to the fiduciary attorney-client relationship. There is no dispute that the Supiks often questioned certain advice given by Bodie, Nagle, but they nonetheless agreed to follow the advice, because they presumed that the lawyers knew best, as discussed *infra*. Among the more significant contro-

---

judicial estoppel. That issue was not raised in this case, either at the circuit court or on appeal.

3. A synthetic toxic compound used in pesticides.

versies between the Supiks and Bodie, Nagle were (1) the attorneys' several attempts to settle the case without informing the Supiks, misinforming the Supiks regarding settlement, and/or botched settlement efforts, and (2) Bodie, Nagle's waiver of the Supiks' right to trial by jury over their objection and without their consent.[4]

An array of events occurred which the parties have addressed in their briefs, highlighting the imperfect attorney-client relationship. The Supiks assert:

(a) that the Appellees requested that Appellants keep a journal describing what had happened to them during the time they were exposed to Chlordane and that, despite representations by the Appellees that the journal would be kept confidential, the journal was turned over to defense counsel [and ultimately used to cross-examine appellants during depositions];

(b) [in regard to appellants' likelihood of prevailing against their homeowner insurer] a dispute between the Appellees and the Appellants arose in connection with the extent of coverage for property loss under their homeowners' policy for compensation related to Chlordane exposure. Appellants believed they had full replacement value whereas Appellees believed the policy provided for fair market compensation for property loss. [Appellants were never able to convince appellees, and they felt as though they should have been able to settle for more than $22,000.]

(c) that one of the Appellees, Kelly Koermer, represented to Appellants that a demand could be made upon the homeowner[s'] insurer in the amount of $450,000.00 [in 1995], when later [in 1996] it was learned by Appellants that the settlement demand had actually been made as to all the defendants in the Toxic Tort Case, and not just simply the homeowner[s'] insurer defendant, American Insurance Company.

---

4. In support of its motion for summary judgment, Bodie, Nagle relied primarily on those particular events.

(d) that in the latter part of 1996, Appellee, Thomas Dolina, advised Appellants that he did not believe they would prevail on the multiple chemical sensitivity claims they were asserting. Although Appellants did not agree with Mr. Dolina's assessment, they agreed to drop their multiple chemical sensitivity claim.

(e) that Mr. Dolina advised Appellants he was concerned they would lose their psychological claim for damages in the case if it were to proceed to trial. This upset Mr. Supik who was concerned that the Appellants were adopting the defense spin that the Appellants suffered pre-existing psychological conditions. [Appellants felt that Dolina was not giving accurate information in this regard.]

(f) that Mr. Dolina made a demand on behalf of the Appellants in the amount of $550,000.00 [in December 1996] which they had not authorized and which upset them when they learned about it.

(g) that Mr. Dolina advised Appellants that, in his opinion, Appellants' case had an approximate settlement value of $300,000.00 Mr. Supik disagreed with that assessment but did not discuss the issue with any of the Appellees. [Although, appellee Kelly Koermer had "often said don't worry about it, that's Tom, he always deals with the case as a devil's advocate."]

(h) that as of January 2, 1997, Appellants did not believe they had sufficient information to consider the possibility of any settlement discussions, despite Mr. Dolina's desire to discuss settlement with the homeowners' insurer.

(i) that on January 6, 1997, Mr. Dolina wrote to Appellants advising that he was considering converting the case from a jury trial to a bench trial. Appellants were unhappy with Mr. Dolina's recommendation to convert their case [as] is reflected in a letter dated January 14, 1997.

(j) that Appellants later learned that Mr. Dolina had, despite their objection, converted the case to non-jury. This angered Appellants, who demanded that Mr. Dolina reverse his actions and change the case back to a jury trial because

they believed they had a better chance of success if the case were heard by a jury.

(k) that Appellees represented to Appellants that they had received an estimate from someone willing to demolish or dispose of one of the two contaminated properties for $9,500.00. The Appellees, however, did not provide Appellants with copies of that estimate despite repeated written and oral requests for same.

(*l*) that on March 7, 1997, the Appellants reluctantly agreed to settle their claim with the homeowner[s'] insurer for $22,000.00 despite their strong desire not to settle the claim. Appellants depict their decision to settle the Homeowners' Case as being made under duress.

(m) that following their settlement of the Homeowners' Case, Appellants and the Appellees continued their efforts to prepare for the Toxic Tort Case against B & B and Home Paramount [scheduled for April 1, 1997]. The Appellants expressed concerns as to the method by which they were being prepared [in a March 19, 1997, letter to Mr. Dolina].

(n) that throughout the years 1996 and 1997, Appellants made numerous requests for copies of the reports and depositions generated in their case so they would be able to evaluate any settlement offers conveyed and have a better understanding as to the extent of their health conditions and the extent of any contamination to their persons and property. Such requests were made verbally and in writing, although Appellants did not receive all the requested documents until sometime after December of 2000.

The essence of the Supik's malpractice action is that they settled the toxic tort case against the pest control companies for less than full value.[5] Unknown to the Supiks, the attor-

---

5. The Supiks settled first with their homeowners' insurer on March 7, 1997, for $22,000. The Supiks, however, felt that they were under "duress" to settle, or otherwise "forced" to settle, by appellee Dolina. Nonetheless, they agreed to the settlement. Their malpractice claim is not based on the settlement with their homeowners' insurer. They did

neys had relied on remediation estimates from the pest control companies without seeking an independent estimate from an expert of their own choosing. The settlement with B & B Exterminators, Inc. and Home Paramount Pest Control Company occurred on April 1, 1997, and was placed on the record in open court on April 3, 1997.[6]

In early May 1997, the Supiks spoke with one of the experts who had planned to testify on their behalf had their case gone to trial. They learned from him that they had made a "major mistake" by settling the toxic tort case for $175,000 because, in the expert's view, the claim had a much higher value.[7] As a result of this information, the Supiks sent a letter to Bodie, Nagle on May 6, 1997, seeking to repudiate the agreement. Bodie, Nagle informed the Supiks that they could not repudiate the settlement agreement, but the Supiks insisted otherwise. Bodie, Nagle then moved to strike their appearance as counsel for the Supiks, which the court granted on July 8, 1997.

The Supiks persisted in their efforts to repudiate the settlement agreement by filing, *pro se*, motions in the circuit court. They were unsuccessful and appealed the circuit court's denial of their motion to vacate the judgment to this Court in 1998. In an unreported opinion, we held that the trial court had properly enforced the settlement agreement. *Supik v. B & B Exterminators, Inc.*, No. 72, Sept. Term, 1988 (Md.Ct. Spec.App., Oct. 22, 1998), *cert. denied*, 352 Md. 619, 724 A.2d 21 (1999).

On March 31, 2000, the Supiks, again acting *pro se*, filed a sixteen-count legal malpractice complaint against Bodie, Na-

---

not raise this issue in their complaint against Bodie, Nagle, other than footnoting the issue for general background purposes.

6. The settlement was memorialized in a Settlement Agreement and Release on May 21, 1997.

7. In disbursement of the settlement proceeds, the Supiks received a net of $56,791.88. *See Supik, et ux, v. B & B Exterminators, Inc., et al*, No. 72, Sept. Term, 1998, slip op. at 3 (Md. Ct. Spec.App., Oct. 22, 1, *cert. denied*, 352 Md. 619 (1999)).

gle, which answered on May 2, 2001, raising an affirmative defense of statute of limitations, in addition to other defenses, and a general denial of the facts alleged. A trial date was set for September 9, 2002.

After the conclusion of discovery, Bodie, Nagle moved for summary judgment on the grounds that the Supiks knew, or reasonably should have known, about their negligent representation prior to March 31, 1997. The trial court, although expressing some reluctance, granted summary judgment, ruling that the Supiks were legally put on inquiry notice prior to March 31, 1997 (the day prior to the effect of the settlement agreement with the tort defendants).

In finding that the Supiks had been put on notice (or that a reasonable person in their position would have been put on notice), the circuit court relied primarily on the fact that they felt under "duress" to settle the claim against their homeowners' insurer for $22,000, as of March 7, 1997; in essence missing the three-year statute of limitations deadline by twenty-four days. The court opined that it was that event, not the later settlement with the tort defendants, that put the Supiks on notice.

The Supiks subsequently retained counsel and have noted a timely appeal to this Court.

## STANDARD of REVIEW

At the summary judgment stage, a trial court's function "is to determine whether there is a [genuine] dispute as to any material fact sufficient to require an issue to be tried." *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 93, 756 A.2d 963 (2000) (citations omitted); *see also* Md. Rule 2–501(e) (2003); *Murphy v. Merzbacher*, 346 Md. 525, 697 A.2d 861 (1997). Accordingly, our review on appeal requires us to determine whether a genuine dispute of material fact existed, and if the trial court was legally correct. *Frederick Rd., supra*, 360 Md. at 93, 756 A.2d 963. Summary judgment is not a substitute for trial; rather it is applied to dispose of cases when no genuine dispute of material fact exists. *Okwa*

*v. Harper*, 360 Md. 161, 178, 757 A.2d 118 (2000). A trial court, in granting a motion for summary judgment, is limited to ruling on matters of law, and may not resolve factual disputes. *Id.* (citation omitted). As such, all facts, and reasonable inferences therefrom, must be viewed in a light most favorable to the non-moving party, here the Supiks. *Id.* (citation omitted).

Yet, at the same time, Maryland's appellate courts have repeatedly stated that the determination of when a cause of action "accrues" under § 5–101 of the Courts and Judicial Proceedings Article is one left to the court for judicial determination. *Frederick Rd., supra*, 360 Md. at 95, 756 A.2d 963. "This determination may be based solely on law, solely on fact, or on a combination of law and fact, and is reached after careful consideration of the purpose of the statute and the facts to which it is applied." *Id.* at 95, 756 A.2d 963 (citing *Poffenberger v. Risser*, 290 Md. 631, 634, 431 A.2d 677 (1981)). Indeed, several cases seem to suggest that the factual determination may be made by the court. Judge Rodowsky, however, speaking for the Court of Appeals in *O'Hara v. Kovens*, 305 Md. 280, 295–97, 503 A.2d 1313 (1986), put to rest any contemplation that a judge determines issues of fact at the summary judgment stage. In dispelling that concept, he wrote, "[t]he notion that all aspects of a limitations defense, including the resolution of conflicting facts and inferences, is a function of the court alone can be traced to misinterpretations in certain opinions by the Court of Special Appeals of decisions by this Court concerning the discovery rule in the era prior to *Poffenberger*, 290 Md. 631, 431 A.2d 677." *Id.* at 297, 431 A.2d 677. In so doing, the *O'Hara* court confirmed that "ordinary principles governing summary judgment . . . continue to apply when the issue on summary judgment is limitations. . . ." *Id.* at 304, 503 A.2d 1313 (citations omitted). We read *O'Hara* and *Frederick Road* directing that **only** when there is no genuine dispute of material fact as to when the action accrued, should a trial court grant summary judgment

on the basis of limitations; otherwise, the question is one of fact for the trier of fact.[8]

██ In the case *sub judice,* the question of accrual also focuses on whether appellants were put on inquiry notice at

---

8. We note the dilemma before the trial court as to whether the court was faced with a question of law, fact, or both, and whether the court could, as a matter of law, determine the factual date of inquiry notice. The following discussion ensued during a hearing on the motion for summary judgment:

THE COURT: Ma'am, understand that what you're repeating is Mr. Supik's argument that there can be disputes between an attorney and a client and I accept that fact. That's not the point. The point is, when these things happened in March of 1997, were you put on notice—

SHIRLEY SUPIK: No, sir we—

THE COURT: Ma'am excuse me. Just simply saying "no" doesn't make it so. The point is, this is either a legal question or a factual question. If it's a factual question, then the jury has to decide it. But if there are no dispute[s] as to the facts, then it's a legal question, it's for me to decide.

MR. SUPIK: There's a lot of dispute in the facts.

THE COURT: There's no dispute that on the day in question, you all didn't want to accept the amount of settlement.

SHIRLEY SUPIK: Didn't like it. That doesn't mean we didn't take our attorneys advice.

MR. SUPIK: That's the whole idea, Your Honor. Nothing showed us we were harmed at that time.

THE COURT: That's not the point though, Mr. Supik. I'll say it for the third time now. I believe it's not whether you knew you were harmed. It's whether something happened that should have caused you to investigate the matter further to find out if you were harmed.

MR. SUPIK: Who answers that question, Your Honor?

THE COURT: I guess I have to. If you're not disputing on that day the conversation that [APPELLEE'S COUNSEL] reported to me from the deposition took place, then those facts are established.

MR. SUPIK: That doesn't admit harm?

THE COURT: Mr. Supik that's the fourth time. You don't want to accept the fact that's not the test. It's not whether you were harmed on that day or not, it's whether somebody should have told you maybe I have been harmed and maybe I better investigate....

\* \* \*

MR. SUPIK: Is it possible that we're arguing something we don't need to, Your Honor?

THE COURT: I don't know.

MR. SUPIK: We didn't know we were harmed [when we settled the toxic tort case], so I'm not sure where the statute applies.

THE COURT: You know, Mr. Supik—now I'll say it for the fifth time—

some time before March 31, 1997 (assuming the prior existence of a cause of action as we will discuss, *infra* ). In other words, Bodie, Nagle argued that their representation was so careless that an objective person would have been put on notice about their negligent actions at a much earlier time, certainly earlier than May, 1997, when the Supiks basically conceded that they knew they were harmed. In this regard, a determination must be made as to whether a reasonable person would have been put on notice, which necessarily involves the "assessment of the credibility or believability of the evidence[.]" *Frederick Rd., supra*, 360 Md. at 96, 756 A.2d 963. To this, the Court of Appeals has stated:

> "whether or not the plaintiff's failure to discover his cause of action was due to failure on his part to use due diligence, or to the fact that defendant so concealed the wrong that plaintiff was unable to discover it by the exercise of due diligence, is ordinarily a question of fact for the jury."

*Id.* at 96, 756 A.2d 963 (quoting *O'Hara, supra*, 305 Md. at 294–95, 503 A.2d 1313 (citations and internal quotations omitted)); *see also Doe v. Archdiocese of Wash.*, 114 Md.App. 169, 176, 689 A.2d 634 (1997) ("When the viability of a statute of limitations defense hinges on a question of fact . . . the factual question is ordinarily resolved by the jury, rather than by the court.").

## DISCUSSION

### Statute of Limitations

In Maryland, a three-year statute of limitations applies to legal malpractice actions pursuant to § 5–101 of the Courts and Judicial Proceedings Article. ("C.J.") *Fairfax Savings, F.S.B. v. Weinberg & Green*, 112 Md.App. 587, 612, 685 A.2d 1189 (1996). Section 5–101 states that "A civil action at law shall be filed within three years from the date it accrues. . . ." Md.Code Ann., C.J. § 5–101 (Repl.Vol.2002). Statutes of limitations serve to " 'provide adequate time for a diligent plaintiff to bring suit as well as to ensure fairness to defendants by encouraging prompt filing of claims.' " *Fairfax*

*Savings, supra,* 112 Md.App. at 612, 685 A.2d 1189 (quoting *Hecht v. Resolution Trust Corp.,* 333 Md. 324, 338, 635 A.2d 394 (1994)). Such statutes are, in short, a reflection of public policy established by the General Assembly regarding a reasonable time in which to file suit. *Murphy, supra,* 346 Md. at 531, 697 A.2d 861; *Doe, supra,* 114 Md.App. at 176, 689 A.2d 634.

Historically, a cause of action accrued on the date the wrong occurred. *Doe, supra,* 114 Md.App. at 176, 689 A.2d 634. Over time, however, Maryland courts and the Legislature recognized the harshness of the rule, and both have tempered the "date of the wrong" rule for accrual purposes in situations where it was impossible or unreasonable for a plaintiff to have sufficient notice of the nature and cause of the injury. *Id.* at 177, 689 A.2d 634. Such cases involve factual scenarios where the plaintiff had not learned about the injury because of fraud, stealth, subterfuge, or other difficulties (such as latent injuries), or when the plaintiff had relied upon a continuing relationship with another party, or when the plaintiff was under a disability at the time of the injury.

Presently, there are at least four situations in which the accrual date is not the "date of the wrong," but some point later in time after the injury has already occurred, three of which were recently discussed in some detail by the Court of Appeals in *Frederick Rd.,* 360 Md. at 95–99, 756 A.2d 963, in the context of legal malpractice.

### Discovery Rule

First, and perhaps most often discussed, is the "discovery rule." Under the discovery rule an "action is deemed to accrue on the date when the plaintiff knew or, with due diligence, reasonably should have known of the wrong." *Doe, supra,* 114 Md.App. at 177, 689 A.2d 634. The discovery rule "is not so much an exception to the statute of limitations, as it is a recognition that the Legislature, in employing the word 'accrues' in § 5–101, never intended to close our courts to plaintiffs inculpably unaware of their injuries." *Murphy, supra,* 346 Md. at 532, 697 A.2d 861 (citations omitted). As we

noted previously, the date when a particular plaintiff knows or, with due diligence, objectively should have known of the wrong, is generally a factual determination for a jury, and not the court. *Frederick Rd., supra*, 360 Md. at 96, 756 A.2d 963; *Doe, supra*, 114 Md.App. at 178, 689 A.2d 634.

### Continuation of Events Theory

A corollary accrual doctrine recognized by Maryland courts is the "continuation of events" theory. *Frederick Rd., supra*, 360 Md. at 97, 756 A.2d 963.

"[I]n cases where there is an undertaking which requires a *continuation of services*, or the party's right depends upon the happening of an event in the future, the statute begins to run only from the time the services can be completed or from the time the event happens."

*Id.* at 97, 756 A.2d 963 (quoting *W., B. & A. Elec. R.R. Co. v. Moss*, 130 Md. 198, 204–05, 100 A. 86 (1917)). The continuation of events theory is based on the equitable principle of detrimental reliance. When a relationship develops between two parties, built on trust and confidence, the confiding party may rely upon the "good faith of the other party so long as the relationship continues to exist." *Id.* at 98, 756 A.2d 963. This is especially true in fiduciary relationships such as the attorney-client relationship where "a client has the right to rely on his or her lawyers' loyalty and to believe the accuracy and candor of the advice they give." *Id.* at 103, 756 A.2d 963.

[A] client's right to rely upon his or her attorney's advice is

"founded upon public policy, because the *confidential and fiduciary relationship enables an attorney to exercise a very strong influence over his client* and often affords him opportunities to obtain undue advantage by availing himself of the client's necessities, credulity and liberality."

*Id.* at 102, 756 A.2d 963 (quoting *Hughes v. McDaniel*, 202 Md. 626, 633, 98 A.2d 1 (1953)).

Notwithstanding the confidential relationship, if the confiding party knows, or reasonably should know, about a

past injury, accrual for statute of limitations purposes will begin on the date of inquiry notice, and not the completion of services. "The confiding party, in other words, is under no duty to make inquiries about the quality or bona fides of the services received, unless and until something occurs to make him or her suspicious." *Id.* at 98, 756 A.2d 963.

### Fraud

 A third category that will postpone an accrual date is fraud, as governed by § 5–203 of the Courts and Judicial Proceedings Article. The fraud exception is essentially a tangent of the discovery rule. If an adverse party fraudulently conceals knowledge of a cause of action, "the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud." C.J. § 5–203 (Repl.Vol.2002). Much like the discovery rule, a person is said to be on inquiry notice when a reasonable person would have used due diligence to investigate the fraud or the underlying injury. *See Frederick Rd., supra,* 360 Md. at 98–99, 756 A.2d 963. Of course, this scenario often begs the question: if a party is perpetrating fraud in such a manner as to obfuscate the confiding party, would a reasonable person be otherwise attuned to the fraud? Additionally, a plaintiff wishing to invoke C.J. § 5–203 must plead fraud with particularity. *Doe, supra,* 114 Md.App. at 187, 689 A.2d 634.

### Plaintiff Under a Disability

A fourth situation that may postpone the date for accrual occurs when a plaintiff is under a "disability" at the time of the injury. Under § 5–201 a "minor or mental incompetent . . . shall file his action within the lesser of three years of the applicable period of limitations after the date the disability is removed." C.J. § 5–201 (Repl.Vol.2002); *Murphy, supra,* 346 Md. 525, 697 A.2d 861.

### Date of the Injury/Harm—Existence of a Cause of Action

 While we have noted four situations in which the accrual date is tolled or postponed to a point later in time from

when the injury actually occurred, or the "date of the wrong," we highlight the fact that none of these tolling concepts is even relevant until a plaintiff has sustained a legal injury, and a cause of action has "arisen." It is the real, but subtle, difference between the date when a cause of action is said to "arise" and the date when a cause of action is said to "accrue."[9] Simply stated, while it may be that a reasonable person might be able to foresee a future injury, the date of accrual for an independent cause of action can not be any earlier than the date(s) of the actual injury. On this point, this Court has previously stated:

> A cause of action does not accrue ... until all elements are present, including damages. *Baker, Watts & Co. v. Miles & Stockbridge,* 95 Md.App. 145, 187, 620 A.2d 356 (1993). Accrual occurs when some evidence of legal harm has been shown, even if the precise amount of damages is not known, *American Home Assurance v. Osbourn,* 47 Md.App. 73, 86, 422 A.2d 8 (1980), *cert. denied,* 289 Md. 739 (1981), and even if plaintiff has suffered only "trivial injuries." *Mattingly v. Hopkins,* 254 Md. 88, 95, 253 A.2d 904 (1969). *See also Feldman v. Granger,* 255 Md. 288, 296, 257 A.2d 421 (1969) (ignorance as to the exact amount of damages sustained at discovery of wrong "is not a sufficiently sound reason to postpone the accrual of the action or toll the running of limitations"). The dispositive issue in determining when limitations begin to run is when the plaintiff was put on notice that he may *have been injured. Russo v. Ascher,* 76 Md.App. 465, 470, 545 A.2d 714 (1988).

*Fairfax Savings, supra,* 112 Md.App. at 613, 685 A.2d 1189 (emphasis added);[10] *Edwards v. Demedis,* 118 Md.App. 541,

---

9. As we will discuss *infra,* a cause of action "arises" when all elements of a legal claim are present. The "accrual" date, and when the statue of limitation begins to run, is the date when a plaintiff knows, or with due care should have known, that the cause of action has arisen. See *Young v. Medlantic Lab: P'ship,* 125 Md.App. 299, 306, 725 A.2d 572, *cert. denied,* 354 Md. 572, 731 A.2d 970 (1999).

10. We have added emphasis to show that the injury refers to a past injury, and not a possible or future injury.

553, 703 A.2d 240 (1997), *cert. denied,* 349 Md. 234, 707 A.2d 1328 (1998); *see also Doe, supra,* 114 Md.App. at 177, 689 A.2d 634. " . . . [A]ctions accrue when the wrong is discovered or when with due diligence it should have been discovered . . . assuming, of course, *that all elements of the cause of action exist at that time." James v. Weisheit,* 279 Md. 41, 45 n. 4, 367 A.2d 482 (1977) (citations omitted) (emphasis added).

## The Merits

Turning to the merits of the case *sub judice,* we are confronted with two inquiries: (1) was there a legal cause of action, and if so, when did that occur?; and (2) if the cause of action arose prior to March 31, 1997, was the accrual date tolled beyond that date based on one of the tolling provisions discussed, *supra?*

▆▆▆▆ In order to determine whether a legally cognizable cause of action existed, we must look to the elements of legal malpractice. "[A] former client may have an action against a lawyer if the client can prove (1) the attorney's employment, (2) the attorney's neglect of a reasonable duty, and (3) loss to the client proximately caused by that neglect of duty." *Thomas v. Bethea,* 351 Md. 513, 528–29, 718 A.2d 1187 (1998) (citing *Flaherty v. Weinberg,* 303 Md. 116, 128, 492 A.2d 618 (1985)).[11] A legal malpractice action, therefore, is similar to any other negligence claim which requires that a plaintiff prove duty, breach, causation, and damage. The absence of any one of those elements will defeat a cause of action in tort. *See Flaherty, supra,* 303 Md. at 134, 492 A.2d 618. As such, a

---

11. A lawyer may be held liable for malpractice in cases that have previously settled. *Thomas, supra,* 351 Md. at 521–24, 718 A.2d 1187. Such liability stems from two different grounds. Liability can attach when a lawyer's general deficiencies have compromised the opportunity to receive more at trial (or a favorable outcome for that matter), such that the client is essentially forced to settle. *Id.* at 522, 718 A.2d 1187. Additionally, a lawyer may be held liable if he or she fails to know "relevant facts or law or to appreciate the real value of the case." *Id.* at 522, 718 A.2d 1187. In the latter situation, the client is not knowingly forced to settle, but rather the lawyer misinformed his or her client about what the case was worth.

cause of action arises " 'when facts exist to support each element.' " *Owens–Illinois v. Armstrong,* 326 Md. 107, 121, 604 A.2d 47 (1992) (quoting *Owens–Illinois v. Armstrong,* 87 Md.App. 699, 724–25, 591 A.2d 544 (1991)), *cert. denied,* 506 U.S. 871, 113 S.Ct. 204, 121 L.Ed.2d 145 (1992).[12]

Because Bodie, Nagle has essentially conceded, for purposes of its motion for summary judgment, an array of negligent acts,[13] *(i.e.,* a breach of duty) our focus in the present case requires us to determine whether the Supiks incurred injury as a result of those acts, and if so, when the injury occurred. The concept of "harm" for negligence actions in Maryland case law generally refers to " 'the existence of loss or detriment in fact of any kind to a person resulting from a cause.' " *Owens–Illinois v. Armstrong,* 87 Md.App. at 734, 591 A.2d 544 (quoting The Restatements (Second) of Torts § 7(2) (1965)), *rev'd on other grounds,* 326 Md. 107, 604 A.2d 47; *see also* BLACK'S LAW DICTIONARY 718 (6th ed.1990) (having the same definition of harm and referring the reader to the definitions for damages, injury, and physical injury). Injury refers to " 'the invasion of any legally protected interest of another.' " *Hearst Corp. v. Hughes,* 297 Md. 112, 118, 466 A.2d 486 (1983) (quoting Restatements (second) of torts § 7(1) (1965)).[14]

---

**12.** While the Court of Appeals was interpreting when a cause of action arises in the context of then § 11–108 of the Courts and Judicial Proceedings Article, which placed a cap on non-economic damages after July 1, 1986, we note its reliance in this regard on *Harig v. Johns-Manville Products,* 284 Md. 70, 394 A.2d 299 (1978), a case dealing with accrual of a cause of action in a statute of limitations action for an asbestos-related injury. *Owens–Illinois, supra,* 326 Md. at 121, 604 A.2d 47.

**13.** In its summary judgment motion, as reiterated in its reply brief, Bodie, Nagle took the position that if the case went to trial, it would have been able to prove that the undisputed facts cited in its summary judgment motion were actually not true. At oral argument, Bodie, Nagle's counsel suggested that there were 20 separate breaches of the standard of care.

**14.** According to Comment a. to § 7 of the Restatements (Second) of Torts:

We find this Court's discussion of "injury" in *Edmonds v. Cytology Serv. of Maryland, Inc.*, 111 Md.App. 233, 681 A.2d 546 (1996), *aff'd sub nom., Rivera v. Edmonds*, 347 Md. 208, 699 A.2d 1194 (1997), helpful in our analysis. In *Edmonds*, we were faced with determining what constitutes an "injury" in a medical malpractice action, for purposes of the statute of limitations under § 5–109 of the Courts and Judicial Proceedings Article. We concluded that a patient sustains an injury when "he or she first sustains compensable damages that can be proven with reasonable certainty." *Id.* at 270, 681 A.2d 546 (citations omitted). Among other supporting reasons, we came to this conclusion by application of the standard definition of negligence which requires *"actual injury or loss* [.]" *Id.* at 258, 681 A.2d 546.

Also discussed in *Edmonds,* relevant to our analysis, is the concept that a negligent act may not result in an injury, or if it does, the injury does not always occur simultaneously with the negligent act. *Id.* at 257, 681 A.2d 546. "The real cause of action in a negligence action is not the negligent act but the injury resulting therefrom, since to support the action there must be not only the negligent act, but a consequential injury, and the injury is the gravamen of the charge." 65 C.J.S. *Negligence* § 56, at 352 (2000) (footnotes omitted). Moreover, we emphasize that the mere possibility of an injury in a negligence action does not give rise to a cause of action. *See Morris v. Osmose Wood Preserving*, 340 Md. 519, 536, 667 A.2d 624 (1995).[15]

---

The word "injury" is used throughout the Restatement of this Subject to denote the fact that there has been an invasion of a legally protected interest, which, if it were the legal consequence of a tortious act, would entitle the person suffering the invasion to maintain an action of tort. It differs from the word "harm" in this: "harm" implies the existence of loss or detriment in fact, which may not necessarily be the invasion of a legally protected interest.

**15.** In *Morris*, the Court of Appeals was faced with, among other issues, determining whether the plaintiffs could recover for "economic loss" caused without actual injury. The Court ruled that absent actual injury, only the allegation of "clear danger of death or *serious* personal injury" was sufficient to survive a motion to dismiss in an economic

█ Appellants argue that they incurred no injury until the day of settlement with B & B Exterminators, April 1, 1997. Alternatively, they argue that even if injury did occur prior to that day, the discovery rule or continuation of services theory should toll the accrual date to a point later than March 31, 1997. Bodie, Nagle takes the position that a legal cause of action accrued well before April 1, 1997, even as early as 1995. By citing the litany of events to which we have earlier referred, they argue that the Supiks were harmed by the deficiencies at the very latest by March 19, 1997, the day the Supiks sent a letter to the law firm expressing concerns about the course that trial preparation was taking.[16]

Bodie, Nagle cites *Edwards v. Demedis*, 118 Md.App. 541, 553, 703 A.2d 240 (1997), for the proposition that Maryland does not follow the "maturation of harm" rule and that, therefore, a cause of action arises before actual injury occurs as long as there is a probability that an injury will occur. While we agree that Maryland has not adopted the maturation of harm rule, we do not interpret the rule in the same light as does Bodie, Nagle. As the Court of Appeals noted in *Harig v.*

---

loss case. 340 Md. at 536, 667 A.2d 624. In so concluding, the Court also affirmed the dismissal of all tort causes of action because the plaintiffs had only alleged possibilities of injury. *Id.* at 535–36, 667 A.2d 624. Accordingly, we read from Morris that a possibility of injury is not sufficient to withstand a motion to dismiss for failure to state a cause of action. *See also* 65 C.J.S. *Negligence* § 56, at 353 (2000) ("The possibility of injury is not injury itself and, while the possibility that injury may result from an act or omission is sufficient to give the quality of negligence thereto, possibility is insufficient to impose any liability or give rise to a cause of action." (citing *Resavage v. Davies*, 199 Md. 479, 86 A.2d 879 (1952))) (internal footnote omitted).

16. Jeffrey Supik's letter to Dolina is not nearly as consequential as Bodie, Nagle make it to be. Jeffrey Supik wrote to Dolina because of concerns that the attorneys were preparing Jeffrey and Shirley differently for trial. Supik also pursued an earlier request for reports of their expert witnesses. Reading the letter as a whole, we view it as no more than an expression of unease by a client faced with the uncertainties of trial. Bodie, Nagle also argues that because the Supiks felt they had been harmed by certain events that the element of "harm" had been established. Whether a legal cause of action exists turns on the objective presence of all elements, not the subjective perception of an individual.

*Johns–Manville Products*, 284 Md. 70, 394 A.2d 299 (1978), the maturation of harm rule pertains more to the extent of (an already present) injury than to the presence of an injury. *Id.* at 74 n. 1, 394 A.2d 299. Indeed, in *Edwards*, immediately following our announcement that Maryland does not follow the maturation of harm rule, we clarified that "[a] legal wrong must be sustained, but a precise amount of damages need not be known." *Edwards, supra*, 118 Md.App. at 553, 703 A.2d 240 (citation omitted).

 A trier of fact could find that no legally cognizable injury existed sooner than April 1, 1997 when the toxic tort case was settled and, hence, that a cause of action did not exist against Bodie, Nagle until that time. Before that time their claim remained viable, their entitlement was not fixed, and damages remained unliquidated. Further negotiation was possible. They continued to possess the right to present their case and their claim for damages to the court. With the execution of the settlement agreement their potential dissolved into a certainty—there could be no greater recovery than that agreed to. Because it appears that there were a number of allegedly negligent acts prior to that date, a jury could find no injury to the Supiks caused by those acts until the settlement actually occurred on April 1, 1997, and that there was no loss or detriment to them, as they could have at any point prior to the settlement decided not to settle.

Bodie, Nagle relies on *Fairfax Savings, supra*, and *Bennett v. Baskin & Sears*, 77 Md.App. 56, 549 A.2d 393 (1988). We find those cases to be distinguishable, because in both, not only had the plaintiffs (or a reasonable person in their position) been put on notice three years prior to filing suit, but the cause of action became legally compensable three years prior, given the existence of actual injury. In *Fairfax Savings*, for example, the harm occurred in 1987 when the plaintiffs incurred legal fees to defend the cross-claims. 112 Md.App. at 617, 685 A.2d 1189. In *Bennett*, the legal injury occurred at the very latest in 1980 when the law firm executed a promissory note in favor of the consulting firm. 77 Md.App. at 60 & 75

n. 4, 549 A.2d 393. We also find *Edwards, supra,* factually distinguishable because the plaintiffs in that case were aware (or should have been aware) of the legal harm in 1990, three years prior to filing suit, but they were not aware of the "amount of harm sustained" until the formal notice of deficiency by the Internal Revenue Service. 118 Md.App. at 557, 703 A.2d 240. Here, in contrast, while there was obvious dissatisfaction with many things that were said and done by Bodie, Nagle, and questions raised by the Supiks, there was no legal harm prior to the date of settlement. It would be detrimental to the traditional attorney-client relationship to suggest that a client, each time a disagreement arose, should expect to be damaged and be required to consult yet other counsel to review the actions of the attorney earlier retained.

Because the ordinary principles governing summary judgment continue to apply when the issue is summary judgment on grounds of limitations, and because there does exist, in this case, a genuine dispute of material fact, we hold that the trial court erred as a matter of law in granting Bodie, Nagle's motion for summary judgment.

Assuming, *arguendo,* that the Supiks sustained an injury prior to April 1, 1997, we think there is an equally compelling reason to reverse. At the summary judgment stage, all facts, and reasonable inferences therefrom, must be construed in a light most favorable to the non-moving party. Assuming an injury to the Supiks prior to April 1, the question remains whether the "continuation of events" theory would have tolled the accrual of the cause of action. That is an issue for a jury to resolve. *Frederick Rd., supra,* 360 Md. at 104, 756 A.2d 963. We reach that conclusion because the Supiks repeatedly noted that they were relying on their attorneys' advice throughout the representation. Whether it was reasonable for them to continue doing so is a question of fact. *Id.* at 96, 756 A.2d 963 (citing *O'Hara, supra,* 305 Md. at 294–95, 503 A.2d 1313).

Even though the Supiks expressed concerns about the quality of their legal representation as early as 1995, they

alleged that Bodie, Nagle repeatedly eased their concerns and reassured them in several contexts. For example, the Supiks expressed concerns about the settlement with the home-owners' insurer in early March. During a deposition of Jeffrey Supik, the following ensued:

Q. [APPELLEES' COUNSEL]: So you obviously didn't believe what Mr. Dolina was telling you, right?

A. [MR. SUPIK] Right.

Q. My question is, why didn't you go seek a second opinion from somebody else?

A. Because the real people that were responsible was Home Paramount and B & B, and the only way we could get to them was to go through Fireman's Fund. Mr. Dolina said let's get rid of the Fireman's Fund let's get rid of the Fireman's Fund so we don't have to battle with them and get right to the deep pockets. He was telling us that a week or two before we went to Judge Bollinger.

* * *

Q. But I'm just talking about Fireman's Fund right now. You thought that you could get more than the 22,000 from—

A. If my understanding of the policy was accurate, yes, we should have gotten much more.

Q. And you knew that on March 6, and yet you agreed to settle anyway?

A. I believed that on March 6, but I was trusting my attorney who said you don't know what your policy provides.

Similar reassurances were also set out in a letter sent from Bodie, Nagle to the Supiks on January 2, 1997, in which appellee Dolina wrote, "As I indicated over the telephone, it is my opinion that there was little possibility for success against the homeowners insurance, given the language of the policy as well as the general nature of insurance law.... I, therefore, strongly recommend acceptance of those [settlement] funds."

Appellee Koermer gave reassurances to the Supiks on numerous occasions regarding the quality of representation.

When Jeffrey Supik was asked by Bodie, Nagle's counsel in a deposition on February 8, 2002, if it was a mistake for appellee Dolina to abandon the psychological injury claims, he responded:

A. Kelly had a habit of saying, Tom likes to play devil's advocate, that's how the defense is going to treat you, get ready for that. She liked saying that. So whenever Dolina doesn't make too much sense to me at that time, I say, okay, the jury will see it different.

During a deposition on February 15, 2002, the following discussion occurred between Bodie, Nagle's counsel and Jeffrey Supik regarding a December 16, 1996, letter from Dolina to the Supiks:

Q. [APPELLEES' COUNSEL]: In the second to last sentence of this letter, Mr. Dolina tells us that he believes that the case has a combined relative worth for the bodily injury and property damage portion of the claim in a range somewhere around $300,000, do you see that?

A. [MR. SUPIK]: Yes, ma'am.

Q. When you read that, what was your reaction?

A. Yet to be seen. We'll find out in trial.

Q. Did you disagree with Mr. Dolina's assessment of it?

A. Oh, sure. And the reason I disagreed was because when he presented these defense strategies or angles, Kelly often said don't worry about it, that's Tom, he always deals with the case as a devil's advocate.

Shirley Supik also noted that Bodie, Nagle had reassured them about their doubts. When asked in a deposition on February 27, 2002, if she "ever [had] an opportunity to say to [Dolina] you thought he had harmed your case [by changing the case from a jury trial to a bench trial]" Shirley Supik responded, "No, because he told us he thought he was doing it for our case."

As the Court of Appeals recently noted in *Frederick Road,* "A client is entitled to believe a lawyer who says 'I am your lawyer, why not trust me, I am a lawyer, I would not do

anything that is wrong.' " 360 Md. at 101, 756 A.2d 963 (citation omitted). While the Bodie, Nagle attorneys in the present case did not articulate their advice with that degree of specificity (nor did the attorneys in *Frederick Road*), for the same reason that the summary judgment motion was reversed in *Frederick Road*, we must also do the same here; that is, because whether a reasonable person would have been put on notice, notwithstanding the confidential attorney-client relationship, is a question of fact. *Id.* at 103–04, 756 A.2d 963.

On the record in this case, a fact finder could conclude that it was reasonable for the Supiks, untrained in the law, and relying on the fiduciary relationship with their attorneys, to have failed to discover their cause of action at an earlier date.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED.**

**COSTS TO BE PAID BY APPELLEES.**